REVISED MARCH 16, 2010
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 15, 2010

Charles R. Fulbruge III
Clerk

No. 10-20069

LAURA PENDERGEST-HOLT; R. ALLEN STANFORD; GILBERT LOPEZ, JR.; MARK KUHRT,

Plaintiffs – Appellees

v.

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON AND ARCH SPECIALTY INSURANCE CO.,

Defendant – Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-3712

Before HIGGINBOTHAM, CLEMENT, and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In this insurance coverage dispute, various insureds—each faced with civil and criminal allegations that they engaged in a massive Ponzi scheme—seek reimbursement of defense costs under a directors' and officers' liability policy from the policy's underwriters. The district court entered a preliminary injunction ordering reimbursement of defense costs pending its further order. We stayed the order; granted the underwriters' request for expedited appeal; heard oral argument; and now modify the preliminary injunction, affirm the

injunction insofar as it provides for coverage until judicial determination in a separate coverage action, and remand for that determination with special instructions.

I

One year ago last month, the SEC sued three companies founded by R. Allen Stanford, and three individual defendants—James Davis, Laura Pendergest-Holt, and Stanford himself—each an executive with one or more Stanford company. The civil action alleged that the individual defendants orchestrated a Ponzi scheme through the sale to investors of sham certificates of deposit evidencing billions of dollars they invested. The SEC amended the complaint two months ago to include two more Stanford executives—Mark Kuhrt and Gilberto Lopez—as defendants.

The day the SEC brought suit, the district court appointed a receiver to manage the affairs of the Stanford companies named in the SEC action and ordered the seizure of assets in the possession of those entities and the individual defendants. The receivership is meant to "prevent waste and dissipation of the assets of Defendants to the detriment of the investors" and empowers the receiver to take "all acts necessary to conserve, hold, manage, and preserve the value" of the estate.

To that end, the receiver has sued various Stanford financial advisors to recoup assets traceable to the alleged criminal conduct. In the course of those suits, the receiver hired forensic accountant Karyl Van Tassel to detail the roles the Stanford entities played in carrying out the alleged acts. Van Tassel determined that new CD sales were not invested as represented, but were instead used to pay CD interest and redemption payments to existing investors,

as well as to pay commissions and bonuses and make loans to Stanford financial advisors—in short, that the CD sales represented a classic Ponzi scheme.

II

In June 2009, the government brought a parallel criminal case against Stanford, Holt, Lopez, and Kuhrt in the Southern District of Texas. A twenty-one count indictment charged the executives with conspiracy to commit mail, wire, and securities fraud, wire fraud, mail fraud, conspiracy to obstruct an SEC investigation, obstruction of an SEC investigation, and conspiracy to commit money laundering.

James Davis, the former CFO of two Stanford companies, was separately charged with mail fraud, conspiracy to violate the mail, wire, and securities fraud law, and conspiracy to obstruct a proceeding before the SEC. He pled guilty to all charges on August 27, 2009, signing a sworn plea agreement and stating under oath in open court that, together with each of the other named defendants, he had engaged in various acts in furtherance of a Ponzi scheme. These acts included the creation of falsified financial statements, bribery, the concealment of billions of dollars of fraudulent personal loans to Allen Stanford, and the execution of bogus real estate transactions designed to artificially inflate the value of company assets. The district court accepted Davis's guilty plea after finding a factual basis for it.[1]

Meanwhile, the other executives have pled not guilty. Jury selection in their criminal cases, pending before Judge David Hittner in the Southern District of Texas, is scheduled for January 2011. Discovery in the SEC action,

---

[1] See FED. R. CRIM. P. 11(b)(3).

pending before Judge David Godbey in the Northern District of Texas, has been stayed pending the resolution of the criminal trial.

III

The underwriters at Lloyd's and Arch issued a directors' and officers' liability policy to certain Stanford companies, with a total policy limit of $100 million.[2] This type of insurance is generally meant to protect corporate officers and directors and the corporation itself from liabilities stemming from their official conduct.[3]

The policy at issue here pays for, among other things, "[l]oss resulting from any Claim first made during the Policy Period for a Wrongful Act." "Loss" is defined to include necessary legal fees and expenses incurred in defending any judicial or administrative proceeding against a director or officer.

The D&O Policy does not impose a duty to defend.[4] Rather, the executives must defend claims themselves, though the underwriters are responsible for covered defense costs, provided the executives notify the underwriters before they are incurred. If the underwriters consent to payment of those costs, they will pay them no more than once every 60 days.

---

[2] While we refer to a single policy, there are actually two in play: a D&O policy providing the potential for $10 million in coverage and an excess, follow-form policy that adds another $90 million of potential coverage on the same terms as those found in the D&O policy.

[3] Tom Baker & Sean J. Griffith, The Missing Monitor in Corporate Governance: The Directors' & Officers' Liability Insurer, 95 GEO. L.J. 1795, 1801 (2007).

[4] As the Texas Supreme Court has recognized, "[t]his is standard for D&O policies." Prodigy Comms. Corp. v. Agricultural Excess & Surplus Ins. Co., 288 S.W.3d 374, 376 n.3 (Tex. 2009) (citing 3 ROWLAND H. LONG, THE LAW OF LIABILITY INSURANCE § 12A.05[1] (2006)).

After the government filed SEC and criminal actions against them, the executives sought coverage under the policy. The underwriters initially agreed to advance defense costs for Stanford, Holt, and Lopez,[5] pending a "final coverage determination," but expressly reserved the right to deny coverage at any time based on the policy's terms, including exclusions for fraud and money laundering. Agreeing that the policy generally applies to the civil and criminal actions brought against the executives, the parties dispute the applicability of the money laundering exclusion.

The fraud exclusion—which is not at issue here—is useful for comparison. It disclaims coverage for loss:

> [R]esulting from any Claim . . . . brought about or contributed to in fact by . . . any dishonest, fraudulent or criminal act or omission by the Directors or Officers or the Company . . . as determined by a final adjudication.

In other words, the fraud exclusion does not apply until there is a "final adjudication" that the insured engaged in fraudulent conduct. We have no "final adjudication" here, so, as the underwriters concede, the D&O Policy's fraud exclusion cannot be a valid basis for withdrawing defense support.

The money laundering exclusion is different. It bars coverage for loss (including defense costs) resulting from any claim "arising directly or indirectly as a result of or in connection with any act or acts (or alleged act or acts) of Money Laundering," but then provides for qualified reimbursement of defense costs, coupled with the ability to claw back reimbursed funds from the insureds in certain instances:

---

[5] The underwriters later agreed to reimburse Mark Kuhrt's defense costs on the same terms as the other executives.

Notwithstanding the foregoing Exclusion, Underwriters shall pay Costs, Charges and Expenses in the event of an alleged act or alleged acts until such time that it is determined that the alleged act or alleged acts did in fact occur. In such event the Directors and Officers and the Company will reimburse Underwriters for such Costs, Charges and Expenses paid on their behalf.[6]

The D&O Policy defines the term "Money Laundering" broadly, so that it covers more than a violation of a money laundering statute.[7] The policy's definition of Money Laundering includes:

(i)   the concealment, or disguise, or conversion, or transfer, or removal of Criminal Property, (including concealing or disguising its nature, source, location, disposition, movement or ownership or any rights relating thereto); or

(ii)  the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by whatever means) the acquisition, retention, use or control of Criminal Property by or on behalf of another person; or

(iii) the acquisition, use or possession of Criminal Property; or

(iv)  any act which constitutes an attempt, conspiracy or incitement to commit any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii); or

---

[6] Emphasis added.

[7] The provision also bars coverage for the eponymous crime: "any act or acts (or alleged act or acts) which are in breach of and/or constitute an offence or offences under any money laundering legislation (or any provisions and/or rules or regulations made by any Regulatory Body or Authority thereunder)."

(v)     any act which constitutes aiding, abetting, counselling or procuring the commission of any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii).

At its most basic, then, the definition of Money Laundering reduces to the use or possession of Criminal Property, a term which is also broadly drawn to include:

> [P]roperty which constitutes a benefit obtained from or as a result of or in connection with criminal conduct or represents such a benefit (in whole or part and whether directly or indirectly) which the Directors or Officers or the Company (or any person or entity acting on their behalf) knows or suspects or reasonably should have known or suspected that it constitutes or represents such a benefit.

IV

On November 16, 2009, the underwriters by letter advised the executives that the underwriters would no longer provide coverage under the D&O Policy because they had determined, based on the evidence available to them up to that point, that Money Laundering, as defined by the policy, had occurred. Although notice to the executives of this determination came in November, the underwriters denied coverage as of August 27, 2009—the date of CFO James Davis's guilty plea. The underwriters contend that each allegation against the executives in the SEC and criminal actions "aris[es] directly or indirectly as a result of or in connection with any act . . . of Money Laundering." The underwriters urge this reading of the policy even though only one of twenty-one counts charged in the criminal action alleges money laundering as defined by law. In doing so, they rely on the policy's definition of Money Laundering, which is defined to cover much broader conduct than the violation of a money

laundering statute, and the fact that an act need only be "in connection with" an alleged act of Money Laundering to preclude coverage.

To support their "in fact" determination, the underwriters cite the following evidence:

(1)     the SEC action's preliminary finding of "good cause to believe that [the executives] used improper means to obtain investor funds and assets";

(2)     the TRO and preliminary injunction in the SEC action, which froze personal and corporate assets and appointed a receiver;

(3)     the SEC action's preliminary injunction finding that "Stanford engaged in fraudulent conduct, including misappropriating investor funds";

(4)     the examination report and testimony of the receiver's accounting expert, Van Tassel, that investment proceeds were used to pay interest on existing investment products, commissions, and bonuses, and to make loans to employees; and

(5)     the statements of alleged co-conspirator Davis that the executives were behind a "massive Ponzi scheme."

The executives filed suit against the underwriters in the Southern District of Texas on November 17, 2009, seeking damages, a declaration that their defense costs must be reimbursed under the D&O Policy, and a preliminary injunction ordering the underwriters to pay their defense costs until a final judgment on the merits of the coverage dispute. The suit was originally assigned to Judge Gray Miller but was transferred to Judge Hittner, before whom the criminal trial is pending. Judge Hittner heard oral argument on December 17,

2009, where the underwriters presented the evidence listed above, while the executives invoked their Fifth Amendment right not to testify.

Finding that the "money laundering" exclusion most likely would not preclude coverage, Judge Hittner granted the executives' request and prohibited the underwriters from "withholding payment" for all costs "already incurred" by the executives and to be "incurred by them in the future . . . until a trial on the merits in this case or such other time as this Court orders."[8]

The underwriters successfully sought a stay pending expedited appeal in this court and now seek reversal of the preliminary injunction.

V

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[9] "'Although the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed de novo.'"[10] And, "when a preliminary injunction turns on a mixed question of law and fact, it, too, is reviewed de novo."[11] We look first to the executives' likelihood

---

[8] Pendergest-Holt v. Certain Underwriters at Lloyd's of London, ___ F. Supp. 2d ___, 2010 WL 317684, at *14 (S.D. Tex. Jan. 26, 2010).

[9] Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374 (2008).

[10] Byrum v. Landreth, 566 F.3d 442, 445 (5th Cir. 2009) (quoting Women's Med. Ctr. of Nw. Houston v. Bell, 248 F.3d 411, 419 (5th Cir. 2001)).

[11] Id. (citing Speaks v. Kruse, 445 F.3d 396, 399 & n.8 (5th Cir. 2006)).

of success on the merits, but, as we explain below, we will not fully resolve the matter.

## A

By the D&O Policy's terms, the underwriters are not liable for any loss—including damages, judgments, settlements, and defense costs—"arising . . . in connection" with acts or alleged acts of Money Laundering. That said, when allegations of Money Laundering are leveled against the executives, the underwriters may not immediately withdraw all coverage. They must instead pay legal costs incurred by the executives in defending against those allegations "until such time that it is determined that the alleged act or alleged acts did in fact occur."

Texas law applies; it requires us to construe insurance policies using the same rules of construction applicable to contracts generally.[12] "Effectuating the parties' expressed intent," then, is our primary concern.[13] If a policy uses unambiguous language, it must be enforced as written.[14] But, if a policy is susceptible to more than one reasonable interpretation, "[t]his Court has clearly identified that Texas law requires an insurance policy to be construed against the insurer and in favor of the insured"—in other words, in favor of coverage.[15]

---

[12] Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co., 267 S.W.3d 20, 23 (Tex. 2008).

[13] Id.

[14] Id.

[15] National Union Fire Ins. Co. of Pittsburgh, Pa. v. Willis, 296 F.3d 336, 339 (5th Cir. 2002) (citing Lubbock County Hosp. Dist. v. Nat'l Union Fire Ins. Co., 143 F.3d 239, 242 (5th Cir. 1998)); National Union Fire Ins. Co. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991); Blaylock v. Am. Guarantee Bank Liab. Ins. Co., 632 S.W.2d 719, 721 (Tex. 1982)).

Where an exclusionary provision is ambiguous—that is, amenable to two or more reasonable interpretations—the court must adopt the construction urged by the insured so long as that construction is not unreasonable, even if the insurer's construction "appears to be more reasonable or a more accurate reflection of the parties' intent."[16]

Before the district court and in their briefing here, the executives have consistently pushed a reading of the Money Laundering exclusion that would prevent any determination until a final adjudication in the underlying criminal proceeding; they now, however, prudently concede that the "in fact" determination may be made prior to resolution of either the criminal or SEC action and may be heard as a parallel coverage matter.[17] For their part, the underwriters have urged that the policy empowers them to make a determination of coverage at any time, hewing closely to rhetoric suggesting the determination was theirs alone—unilateral. That rhetoric fell away in this court and the underwriters—either softening their position or perhaps more clearly articulating it—now accept that the "determination" is, at the very least, judicially-reviewable and is subject to reconsideration should the executives be cleared of all charges.

---

[16] Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 741 (Tex. 1998) (quoting Hudson Energy, 811 S.W.2d at 555) (internal quotation marks omitted).

[17] The executives also argue that the underwriters' reading of the money laundering exclusion "swallows up" the fraud exclusion. It is true that only one of twenty-one criminal counts brought against the executives alleges "money laundering" as defined by law. But the Money Laundering exclusion's language is sufficiently broad to capture the other twenty counts without rendering the fraud exclusion itself a nullity (each arises directly or indirectly as a result of or in connection with acts or alleged acts of Money Laundering, as defined by the policy). One example of a fraud claim safe from the Money Laundering exclusion would be an alleged reckless failure to disclose material information—e.g., where the company operates an otherwise legitimate business but is alleged to have overstated earnings in public filings.

For all practical purposes, this pending civil matter is that separate coverage action and we treat it accordingly, though two legal issues remain predicate to the ultimate question of coverage: (1) whether the underwriters' duties end when they make an "in fact" determination (subject to judicial review) or whether that determination can only be made in the first instance by a court; and (2) whether a court may examine evidence in making its determination or whether it is instead confined to the underlying complaint's allegations and the D&O Policy's terms. Only after we resolve these questions can a court consider whether the record is sufficient to support a determination that the alleged Money Laundering acts in fact occurred.

B

As for who may make the "in fact" determination, the Money Laundering exclusion is silent; it provides only that the underwriters may stop reimbursement of defense costs when "it is determined that the alleged act or alleged acts did in fact occur." The underwriters maintain that they may make this determination in the first instance, the obligation to advance defense costs ends when they do so, and their decision is subject only to judicial reversal after the fact. The executives assert that the "in fact" determination is not merely judicially-reviewable but must be judicially-made in the first instance; in other words, that the underwriters' duties continue until they have a court judgment in hand, decreeing that Money Laundering was "in fact" committed. The parties' disagreement is subtle but important.

Texas courts give policy terms their "ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical

meaning."[18]  The D&O Policy leaves "determined" and "in fact" undefined. Dictionaries define "determination" as "[a] final decision by a court or administrative agency"[19] and to "determine" as "to fix conclusively or authoritatively," "to decide by judicial sentence," or "to settle or decide by choice of alternatives or possibilities."[20]  Black's Law Dictionary tell us that "in fact" means "[a]ctual or real" or "resulting from the acts of parties rather than by operation of law."[21]

None of these definitions provides a conclusive answer, though taken together they favor a judicial decisionmaker over any other.  In this void, the underwriters—as drafters of the policy—could have unambiguously reserved a unilateral right to determine that the alleged acts in fact occurred.  Rather than saying "until it is determined . . . in fact," they could have avoided ambiguity entirely by providing "until we have determined" or "until Underwriters determined."  The parties' word choice—"it is determined"—leaves us guessing, but it hardly seems a drafting error, at least not an inadvertent one.

Because "[i]t would be possible for carriers issuing D & O policies to explicitly reserve to themselves the unfettered discretion whether to advance defense costs," if an insurer "wants the unilateral right to refuse a payment called for in the policy, the policy should clearly state that right."[22]  As the Eastern District of Pennsylvania put it, an insurer's policy may be silent on this

---

[18] Don's Bldg. Supply, 267 S.W.3d at 23.

[19] BLACK'S LAW DICTIONARY 480 (8th ed. 2004).

[20] MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 315 (10th ed. 1996).

[21] BLACK'S LAW DICTIONARY 792 (8th ed. 2004).

[22] Associated Elec. & Gas Ins. Servs. v. Rigas, 382 F. Supp. 2d 685, 701 (E.D. Pa. 2004)).

issue for good reason: "a policy with such a draconian power [might be] difficult to sell."[23] While there is nothing remarkable about an insurer reserving the right to make a unilateral coverage decision, it is similarly unremarkable to require an insurer to be explicit when doing so, rather than leaving the reader to ponder the word "it."[24]

Without clearer direction from the policy itself, the parties both offer plausible interpretations. Neither is unreasonable: "From the point of view of [the underwriters], to wait for a judicial determination of the elements listed in the [exclusion] means that [they] may have to pay substantial sums for defense costs even though it is later determined" the alleged acts did in fact occur, while "[f]rom the point of view of [the executives], it is unfair to give an insurer the ability to escape its duty to advance payment merely because it asserts the [exclusion], without any judicial decision."[25]

The underwriters nonetheless contend that "it is determined . . . in fact" is not ambiguous because it stands in meaningful contrast to the language of the fraud exclusion. That exclusion is triggered only by a "final adjudication" that fraud "in fact" occurred. Because we must interpret the D&O Policy "in such a way as to give effect to each term . . . so that none will be rendered

---

[23] Id.

[24] Our reading is consonant with the interpretation by other courts that have considered a D&O policy's use of the term "in fact"—without apparent exception these decisions assume court involvement in the decision to cut off the insured from payment for litigation costs and belie any notion of a unilateral right to determine coverage (in the absence of unambiguous language granting such a right). See, e.g., Virginia Mason Med. Ctr. v. Executive Risk Indem. Inc., 2007 WL 3473683, at *5 (W.D. Wash. Nov. 14, 2007) (unpublished).

[25] Axis Reins Co. v. Bennett, 2008 WL 2600034, at *4 (S.D.N.Y. 2008) (unpublished) (quoting Rigas, 382 F. Supp. 2d at 699) (internal quotation marks omitted).

14

meaningless,"[26] the underwriters argue that "determined . . . in fact" must be construed to mean something other than a "final adjudication." They maintain that only the latter requires a judicial decisionmaker.

None of the D&O Policy's other exclusions—which undisputedly allow the underwriters to make a coverage decision—use the terms "it is determined," "in fact," or "final adjudication." And, like the first two phrases, "final adjudication" is left undefined. The underwriters note, however, that the Northern District of California has examined—in an unpublished opinion—the meaning of the term "in fact" from a D&O policy also containing the phrase "judicially determined."[27] Here, though, we do not compare "in fact" with "judicially determined," but rather "determined . . . in fact" with "final adjudication," and the difference means an analogy between the pairs should not be drawn. For one, the D&O Policy's Money Laundering exclusion requires not only an act "in

---

[26] See Willis, 296 F.3d at 339 (citing Lynch Props., Inc. v. Potomac Ins. Co. of Ill., 140 F.3d 622, 626 (5th Cir. 1998); Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998)).

[27] In that case, PMI Mortgage, the court rejected the defendant's contention that mere allegations were sufficient to trigger the "in fact" exclusions, but noted that the policy's use of the term "judicially determined" placed limits on the meaning of "in fact":

> [W]hen read according to its ordinary and popular meaning, the phrase "judicially determined" necessarily limits any final adjudication or factual determination to one that is made by the judiciary, whereas the term "in fact" includes adjudications or determinations that are not made judicially, and is therefore broader in scope. In short, the court holds that the term "in fact" within the context of the exclusion here should be read to require either a final adjudication, including a judicial adjudication, or at a minimum, at least some evidentiary proof that the insured reaped an illegal profit or gain.

PMI Mortgage Ins. Co. v. American Int'l Specialty Lines Ins. Co., 2006 WL 825266 (N.D. Cal. Mar. 29, 2006) (unpublished). When confronting the latter possibility—a proffer of "some evidentiary proof"—the court would then be tasked with "objectively verify[ing]" that the condition is fulfilled. Id. at *5.

fact" but an act "determined" to be so—and, as we have explained, "determined" can denote a legal decision. More important, courts have interpreted both "final adjudication" and "in fact" to require a judicial decisionmaker: the question is not whether a court makes the determination but in which judicial proceeding that determination is made—i.e., whether it is made in the underlying case or in a separate coverage action.

When a D&O policy requires a "final adjudication" to trigger an exclusion, "courts have consistently held that the adjudication must occur in the underlying D&O proceeding," rather than in a parallel coverage action or other lawsuit.[28] The distinction is important because under a "final adjudication" clause, some courts bar insurers, after settlement of the underlying case, from litigating "whether the settled claims were in fact attributable to defendants' dishonest acts."[29] Read this way, a final adjudication exclusion limits the insurer's recourse if the parties settle—the most likely outcome—or if the insured is

---

[28] Dan A. Bailey, D&O Policy Commentary, 702 PLI/LIT 205, 215 (Feb. 17–18, 2004) ("For those forms which require a final adjudication, courts have consistently held that the adjudication must occur in the underlying D&O proceeding (not in coverage litigation) and therefore the exclusion is inapplicable if the claim against the D&Os is settled. [I]f the exclusion does not expressly require an adjudication, the exclusion can apply to settlements."). Accord Atlantic Permanent Fed. Sav. & Loan Ass'n v. American Cas. Co. of Reading, Pa., 839 F.2d 212, 216–17 (4th Cir. 1988) (holding that, given the policy of construing insurance policies against the insurer, the words "a judgment or other final adjudication thereof'" could be reasonably interpreted to refer to the underlying lawsuit for which coverage is sought) (citing Pepsico, Inc. v. Continental Cas. Co., 640 F. Supp. 656 (S.D.N.Y. 1986)).

[29] ERIC MILLS HOLMES, 23 HOLMES' APPLEMAN ON INSURANCE 2D § 146.6 (2003) (quoting Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Continental Illinois Corp., 666 F. Supp. 1180, 1198 (N.D. Ill. 1987)). See also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Brown, 787 F. Supp. 1424, 1429 (S.D. Fla. 1991), aff'd 963 F.2d 985 (11th Cir. 1992) ("[T]he exclusion does not apply at this time because there has been no final adjudication establishing that the Insureds engaged in fraud, dishonesty or criminal acts.").

otherwise absolved of liability or guilt in the underlying action.[30] As the district court in the Enron case explained, "the 'final adjudication' requirement of [the] exclusions implies that where the insured is not found guilty, there is coverage for his costs and expenses in defending himself in a criminal action."[31]

In contrast, courts have generally imbued "in fact" language with a broader scope than "final adjudication," holding, for example, that the term requires a final decision on the merits in either the underlying case or a separate coverage case, or an admission by the insured.[32] These cases do not require a final adjudication by the factfinder in the underlying case, but rather offer it as a coequal alternative to having a court make the assessment in a separate coverage proceeding.[33] In bargaining for "in fact" language, then, the insurer

---

[30] See In re Donald Sheldon & Co., Inc., 186 B.R. 364, 368–70 (Bankr. S.D.N.Y. 1995), aff'd, 182 F.2d 899 (2d Cir. 1999) (holding that absent any indication the jury had actually rendered a verdict based on the excluded conduct, there was no final adjudication of such conduct, even though it worked some unfairness to the insurer who was obviously unable to intervene in the underlying criminal case and pose the necessary, and more specific, question to the jury).

[31] In re Enron Corp. Sec., Derivatives & "ERISA" Litig., 391 F. Supp. 2d 541, 573 (S.D. Tex. 2005).

[32] See, e.g., Westport Ins. Corp. v. Hanft & Knight, P.C., 523 F. Supp. 2d 444, 454–55 (M.D. Pa. 2007); Virginia Mason Med. Ctr., 2007 WL 3473683, at *5.

[33] See Westport, 523 F. Supp. 2d at 455 (finding sufficient evidence in the complaint to make an "in fact" determination). See also PMI Mortgage, 2006 WL 825266 at *7 (holding "that the term 'in fact' within the context of the exclusion here should be read to require either a final adjudication, including a judicial adjudication, or at a minimum, at least some evidentiary proof"); Federal Ins. Co. v. Cintas Corp., 2006 WL 1476206, at *7 (S.D. Ohio May 25, 2006) (unpublished) (holding exclusion did not absolve insurer of duty to defend because "no factual or legal basis currently exists for applying the Exclusion"). Other courts see "in fact," standing alone and without contrasting "final adjudication" language, as essentially meaning "final adjudication." See, e.g., American Chem. Soc'y v. Leadscope, Inc., 2005 WL 1220746, at *11–12 (Ohio Ct. App. May 24, 2005) (unpublished) (finding "in fact" to require a "final adjudication" in the underlying litigation).

reserves the right to litigate the coverage question outside of the underlying action for which insurance coverage is sought.

Here, the Money Laundering exclusion employs similar language—"determined . . . in fact"—and so, in keeping with the weight of the caselaw, implies that the coverage decision is to be made—not in the criminal or SEC actions—but in a parallel and independent proceeding. In contrast, the fraud exclusion's use of the term "final adjudication" means it will not be triggered until resolution of the underlying dispute. Despite these differences, both exclusions leave the decision for the judiciary in the first instance.

Even if the Money Laundering exclusion is also amenable to the underwriters' interpretation, the parties' chosen terms lend themselves to a reasonable interpretation in favor of coverage and we must follow it:[34] we interpret a "determ[ination] . . . in fact"—absent language unambiguously pointing to the underwriters as the decisionmakers—as requiring a judicial act. And, given the contrasting language of the Money Laundering and fraud exclusions, that act must be the result of a separate coverage proceeding.

C

As for the question of what evidence may be considered in making a "determin[ation] . . . in fact," the executives push another Texas fundamental—the "eight corners" rule—which requires courts to measure an insurer's duty to defend by examining only the policy's provisions and the underlying complaint's factual allegations, "without reference to the truth or

---

[34] See Balandran, 972 S.W.2d at 741 (quoting Hudson Energy, 811 S.W.2d at 555).

falsity of such allegations."[35] The executives contend this general rule prohibits the underwriters' attempt to put forth extrinsic evidence in support of an "in fact" determination. The district court agreed.

The Texas Supreme Court has spoken of the eight corners rule only in the context of duty-to-defend cases, and no Texas state court has applied the rule to a case, like the present one, involving a duty to advance defense costs.[36] Whatever the Texas Supreme Court might do to resolve the issue in a future case, however, we need not venture a guess in this one: the D&O Policy's terms plainly state that the underwriters must advance defense costs "until it is determined that the alleged act or alleged acts did in fact occur" and, in so doing, require recourse to something more than mere allegations. The terms contemplate the use of extrinsic evidence in making the determination. Thus, we need not and hence do not pause to decide whether the eight corners rule applies to the duty to advance costs as a general matter, for Texas prefers freedom of contract[37] and honors the well-worn prerogatives of parties to override judge-made doctrines—like the eight corners rule—by contracting around them.[38] After all, it is a contract that we are construing. Assuming but not deciding the eight corners rule would have applied, the parties chose—in

---

[35] Argonaut Sw. Ins. Co. v. Maupin, 500 S.W.2d 633, 635 (Tex. 1973).

[36] Julio & Sons Co. v. Travelers Cas. & Sur. Co. of Am., 591 F. Supp. 2d 651, 659 (S.D.N.Y. 2008) ("While there appears to be no dispute that defendant 'has no duty to defend any Claim' against plaintiff, . . . the Court has found no decisions by the Texas courts concerning a different standard for a duty to advance defense costs . . . .").

[37] See Fairfield Ins. Co. v. Stephens Martin Paving, LP, 246 S.W.3d 653, 664–65 (Tex. 2008).

[38] Fortis Benefits v. Cantu, 234 S.W.3d 642, 648–49 (Tex. 2007).

19

plain language—to displace it and to provide for the use of extrinsic evidence. We must give effect to those bargained-for choices.

Our conclusion rings all the more true because the executives must agree with it to some extent; they contend—rightly—that mere allegations are insufficient to bar coverage under the D&O Policy. But, that is so only if the parties opted out of the eight corners rule. If they did not, the allegations of money laundering and other acts in the criminal and civil complaints, and the policy's broad definitions, might suffice to push the executives out of coverage—undoubtedly a nuance the executives understand quite well.

D

Having concluded that the "in fact" determination must be made by a court in a separate, parallel coverage action, in which all admissible evidence is welcome, we decline to proceed with that action in this court. Rather we will remand for further proceedings.

Because much gear shifting has gone on between Houston and New Orleans, and because Judge Hittner did not have the benefit of the parties' positions on appeal, we cannot read his order as accomplishing the task of a separate coverage action. And as we have seen, the eight corners rule, which found traction in the district court and on which the order relied in part, has proved to be at best a red herring.

Nor can we ignore the awkwardness—readily recognized by Judge Hittner—in putting the civil "cart" before the criminal "horse," especially when the judge who decides the question of coverage, with its demand for assessing the strength of the government's criminal case, is set to later preside over the criminal trial. To extricate the able district judge from an awkwardness that

was not of his choosing, any subsequent coverage proceedings must be before another judge. The question, of course, is one of appearance, not of impartiality. We remand, then, to the Southern District of Texas. There, the chief judge may assign the case to another judge.

On remand this case will be the collateral vehicle for the "determin[ation] . . . in fact" that the D&O Policy contemplates. The district court must decide whether the underwriters are responsible thereafter for reimbursement of the executives' defense costs. We do not comment on the merits of the sought relief.

The underwriters are entitled to a decision in a separate coverage action, for their bargain sought to mitigate the risk of advancing substantial fees on behalf of policyholders should it be found that the insureds did in fact commit Money Laundering as defined in the policy. By the bargain, they are not compelled to remain aboard an aircraft that has lost its wings. Still, a determination at this juncture cannot be final in the sense that, as the underwriters concede, a determination of the facts on remand unfavorable to the executives would have to be reconsidered should the executives be cleared of all charges. That is, the judicial decision required by this coverage action remains subject to modification. This wise concession—based on a calculation of the executives' long-term prospects at trial and of their ability to repay costs should they be convicted—effectively limits the district court's task on remand. The district court will consider the underwriters' future obligation to advance the costs of defense, but its grant of relief from this obligation—if any—remains subject to reconsideration should the executives be exonerated in either the criminal or SEC proceeding. In that event, a court will be able to adduce all facts and make a final coverage determination. This works a sensible

construction of an awkwardly drafted instrument, aided by the equity power of the court to grasp the realities of the situation at hand.

VI

As we have read the policy, the determination is a judicial act, not an affirmation of a unilateral coverage decision. Because the policy remains silent on the standard of proof to apply, whether that decision should be made by a preponderance or only on clear and convincing evidence presents a substantial issue. We need not and hence do not resolve the issue here. Rather, we leave this matter to the district court who, on hearing the evidence, may find that the answer is not outcome determinative.

VII

Necessary to our disposition of this appeal, which is properly before us pursuant to 28 U.S.C. § 1292(a)(1), is the antecedent question of who makes the "determination" that Money Laundering did or did not occur. Because our interpretation of the policy is binding on the parties as a now-resolved matter of law, and because we have decided that a court should weigh the evidence in the first instance, the inescapable conclusion is that regardless of which parties are likely to succeed on the merits, the underwriters are contractually bound to reimburse reasonable defense costs until that merits decision is reached. The practical effect of this legal conclusion is equivalent to the effect of the preliminary injunction entered by the district court, at least insofar as it required the reimbursement of reasonable defense costs until a judicial determination in this coverage action. For that reason, we affirm the

preliminary injunction as modified herein. This conclusion in no way controls the ultimate coverage decision.

## VIII

Our focus has been on the underwriters' obligation to reimburse defense costs, but the D&O Policy also imposes an obligation on the executives to repay those costs if it is determined that they committed acts in connection with Money Laundering. As we have read the policy, the underwriters may seek this determination in a parallel action and, if successful, escape the obligation to make future reimbursements, subject to reconsideration following a favorable verdict in either proceeding.

It follows that the executives' repayment obligations are triggered only by the coverage determination after any reconsideration. Any other reading ignores the realities of the underlying litigation and the purposes of the policy.

## IX

We modify the district court's injunction consistent with this opinion, affirm the district court's order only insofar as it provides for coverage until a court determines otherwise, and remand for further proceedings on the coverage question. The underwriters are enjoined from refusing to advance defense costs as provided for in the D&O Policy unless and until a court determines "that the alleged act or alleged acts [of Money Laundering] did in fact occur." For these costs, the amount of reimbursement found reasonable remains open for determination and that also will lie with the judge on remand. Nothing herein precludes on remand the filing of companion suits for declaratory and injunctive relief or other relief, or, with leave of the district court, amendments to the

parties' pleadings.  Given the effect the determination in this case may have on the executives' ability to secure criminal and civil counsel of their choosing, we are confident that the district court assigned this action on remand will be one able to proceed as expeditiously as is feasible under the circumstances.

MODIFIED, AFFIRMED as modified, and REMANDED with instructions.