# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10849

United States Court of Appeals
Fifth Circuit

**FILED**

August 12, 2015

Lyle W. Cayce
Clerk

CERTAIN UNDERWRITERS AT LLOYDS LONDON;
ARCH SPECIALTY INSURANCE COMPANY,

Plaintiffs–Appellants,

versus

BRUCE PERRAUD; THOMAS RAFFANELLO,

Defendants–Appellees.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:09-CV-2206

Before KING, SMITH, and ELROD, Circuit Judges.

JERRY E. SMITH, Circuit Judge:*

Certain Underwriters at Lloyd's London and Arch Specialty Insurance Co. (collectively, "Underwriters") appeal a summary judgment to reimburse Bruce Perraud and Thomas Raffanello for attorney's fees and costs. We find no error and affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-10849

## I.

Perraud and Raffanello were employees of the Stanford Financial Group Company ("SFGC"), which was covered under a directors' and officers' liability policy issued by Underwriters. Following a successful defense against federal criminal charges, Perraud and Raffanello sought reimbursement for attorney's fees and costs under that policy. Underwriters refused to pay and sued for a declaratory judgment on the basis of a policy exclusion. On cross-motions for summary judgment on stipulated facts, the district court found that the exclusion was ambiguous and interpreted it in favor of coverage pursuant to Texas's doctrine of *contra proferentem*. The court declined to apply a sophisticated-insured exception to that doctrine, concluding that even if Texas were to recognize the exception, Underwriters had presented "no evidence . . . indicating that Stanford negotiated or drafted [the exclusion at issue]." Underwriters do not appeal the finding of ambiguity; they challenge only the application of the sophisticated-insured exception and the denial of their Federal Rule of Civil Procedure 59(e) motion.

## II.

"On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party."[1] "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[2]

The courts that have recognized the sophisticated-insured exception

---

[1] *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001) (citation omitted).

[2] *Johnston & Johnston v. Conseco Life Ins. Co.*, 732 F.3d 555, 561 (5th Cir. 2013) (quoting FED. R. CIV. P. 56(a)), *cert. denied*, 134 S. Ct. 1892 (2014).

have taken a variety of approaches to its application. On one end of the spectrum, some have construed it narrowly, as the district court did here, to apply only where the insured actually negotiated the particular provision at issue.[3] At the opposite extreme are courts that broadly apply the exception any time the insured is a sophisticated business entity, regardless of whether the insured, or someone on the insured's behalf, actually negotiated or drafted portions of the policy.[4] Most courts have taken a middle ground, deeming the exception triggered where the insured—or a broker acting on the insured's behalf—actually negotiates, drafts, or proposes portions of the policy.[5]

---

[3] *See, e.g., Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 7 F.3d 1047, 1053 n.8 (1st Cir. 1993) (noting that the exception is invoked "sparingly" and suggesting that it would not apply where there is "no evidence that [the insured] participated in drafting the language at issue"); *Ogden Corp. v. Travelers Indem. Co.*, 681 F. Supp. 169, 174 (S.D.N.Y. 1988) ("Although [the insured] did in fact negotiate with [the insurer], it cannot be said that [the insured] completely drafted the provisions in question so as to cause the Court to apply a limited exception to the general rule by construing ambiguities in favor of the insurer."); *see also McDermott Int'l, Inc. v. Lloyds Underwriters of London*, 944 F.2d 1199, 1207 (5th Cir. 1991) (applying the exception where the insured's agent chose the provision at issue for inclusion in the policy). The Supreme Court of California takes an even narrower approach, holding that even where the inclusion of the provision at issue has been negotiated by a sophisticated insured, the exception is inapplicable where the language at issue has been "adopted verbatim from standard form policies used throughout the country." *AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1265 n.9. (Cal. 1990).

[4] *See, e.g., St. Paul Mercury Ins. Co. v. Grand Chapter of Phi Sigma Kappa, Inc.*, 651 F. Supp. 1042, 1045 (E.D. Pa. 1987) ("Pennsylvania principles of construction require the Court to resolve an ambiguity of this kind in favor of the insured unless the parties possess equal bargaining power, such as when a large corporation, advised by counsel, is the insured."); *Owens-Illinois, Inc. v. United Ins. Co.*, 650 A.2d 974, 991 (N.J. 1994) ("As the Appellate Division noted, O-I was a sophisticated insured and cannot seek refuge in the doctrine of strict construction by pretending it is the corporate equivalent of the unschooled, average consumer." (internal quotation marks omitted)); *see also Eagle Leasing Corp. v. Hartford Fire Ins. Co.*, 540 F.2d 1257, 1261 (5th Cir. 1976) (stating that "[w]e do not feel compelled to apply . . . [the doctrine of *contra proferentem*] in the commercial insurance field when the insured is not an innocent but a corporation of immense size," though noting also that the policy at issue contained provisions "confected especially for" the insured).

[5] *See, e.g., Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 958 (5th Cir. 2009) ("[U]nder Louisiana law, the presumption does not apply where the insured is a sophisticated commercial entity that itself drafts or utilizes its agent to secure desired policy provisions."); *Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 521 (3d Cir.

No. 14-10849

This appeal is premised on the assumption that Texas recognizes the sophisticated-insured exception in any of its varieties, yet Underwriters, as appellants, chose not to argue that issue on appeal:

> Underwriters does not reargue here whether Texas recognizes the sophisticated insured exception, because it anticipates the Texas Supreme Court will resolve that question before this appeal is heard. Therefore, for purposes of this appeal, Underwriters presumes the sophisticated insured exception will be recognized.[6]

Although Underwriters thus assumed that the Supreme Court of Texas would answer the certified question from this court, the court found it unnecessary to do so.[7] Where an appellant declines to press an issue—and especially, as here,

---

1997) ("[T]he dispositive question is not merely whether the insured is a sophisticated corporate entity, but rather whether the insurance contract is negotiated, jointly drafted or drafted by the insured."); *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 639 (7th Cir. 1991) (applying the exception where "significant portions of the policy's language were customized at [the insured]'s insistence"); *E. Associated Coal Corp. v. Aetna Cas. & Sur. Co.*, 632 F.2d 1068, 1071 (3d Cir. 1980) (applying exception where insured's broker "selected the form, prepared the policies, and sent the policies to the insurers and underwriters for signature"); *Vought Aircraft Indus., Inc. v. Falvey Cargo Underwriting, Ltd.*, 729 F. Supp. 2d 814, 824 (N.D. Tex. 2010) ("The exception is justified where the insured contributes to the drafting of the agreement rather than adopting a contract of adhesion, the contents of the policy are in some way negotiable, and the insured is as capable as the insurer of interpreting the contract." (footnote omitted)); *Cummins, Inc. v. Atl. Mut. Ins. Co.*, 56 A.D.3d 288, 290 (N.Y. App. Div. 2008) (applying the exception where "the evidence . . . shows that while defendant prepared the drafts of the agreement, the basic concept and terms originated with plaintiff, that plaintiff is sophisticated and was instrumental in crafting various parts of the agreement, and that plaintiff, while not an insurance company, had equal bargaining power and acted like an insurance company by maintaining a self-insured retention").

6 Brief for Underwriters at 22 n.8.

7 *See In re Deepwater Horizon*, No. 13-0607, 2015 WL 674744, at *13 (Tex. Feb. 13, 2015) ("The second certified question asks whether the ambiguity rule governs interpretation of the insurance-coverage provision in the Drilling Contract, given the facts of this case. The certified question is directed to resolving the parties' disagreement about whether the rule should apply to insurance-coverage disputes between sophisticated parties . . . . The ambiguity rule comes into play only if there is more than one reasonable interpretation of an insurance policy. Because that is not the situation here, we do not answer the second question." (citations omitted)).

where the appellant explicitly declines to argue it—the issue is waived.[8]

This court followed the doctrine of *contra proferentem* in a case involving the same policy at issue here, stating that "if a policy is susceptible to more than one reasonable interpretation, '[t]his Court has clearly identified that Texas law requires an insurance policy to be construed against the insurer and in favor of the insured'—in other words, in favor of coverage."[9]  Although the sophisticated-insured exception was not raised in *Pendergest-Holt*, Texas's strong policy in favor of coverage informs our understanding of the evidentiary showing that Texas would require to trigger the sophisticated-insured exception, assuming—for the limited purpose of this appeal—that Texas would even recognize the exception.

There is no reason to believe that Texas would adopt an unusually broad sophisticated-insured exception to its longstanding doctrine of *contra proferentem*.[10]  No Texas court has ever recognized the exception, and the state's highest civil court recently declined to do so on a certified question.  We offer no opinion on whether Texas courts would actually recognize it; we only assume the recognition *arguendo* and only for the purpose of determining whether Underwriters have offered enough evidence to create a genuine dispute of material fact as to whether they have satisfied that exception if it did exist.  Because of Texas's doctrine of *contra proferentem*, and because we have

---

[8] *Spear Marketing, Inc. v. BancorpSouth Bank*, 2015 U.S. App. LEXIS 11266, at *34 (5th Cir. June 30, 2015) (stating that argument not advanced in opening brief is waived).

[9] *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 569 (5th Cir. 2010) (alteration in original) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Willis*, 296 F.3d 336, 339 (5th Cir. 2002)).

[10] *See Mut. Life Ins. Co. v. Simpson*, 31 S.W. 501, 502 (Tex. 1895) ("We are not unmindful of the well-recognized rules as to the construction of contracts of insurance,—that forfeitures are not favored, and that generally, in cases where there is doubt or ambiguity, that construction should be adopted most favorable to the assured,—the reasons for which are obvious, and need not be recounted.").

No. 14-10849

no indication that Texas courts would recognize an extremely broad sophisticated-insured exception, we will not assume for purposes of this appeal that Texas would do so.  Thus, our analysis is limited to the narrow and middle-ground variations on the doctrine.

The only summary-judgment evidence of SFGC's bargaining power is a declaration by Paul Sewell, the head of claims for one of Underwriters' syndicates, that there "was a negotiation between [Underwriters] and [SFGC's broker] in terms not only of pricing, but also terms and conditions that would have been implemented into the policy."  Sewell admitted that his contention that some negotiations occurred was not based on his actual involvement in the negotiations or on information that someone else had told him, but rather "through thirty years of working the industry, [he] understands the process." Likewise, in response to a question about whether he would "just . . . talk about the process, not necessarily the particulars of this file," Sewell responded that he could not "talk about the actual negotiations, as [he] wasn't on the underwriting side, so [he] wasn't involved in the actual negotiation," but was familiar with "how that process works in London" from "a global perspective."

Sewell's bare assertion that some negotiation occurred based on his general understanding of industry processes is insufficient to create a genuine dispute of material fact as to the exception's applicability under the narrow or middle-ground approaches.  Underwriters do not challenge the district court's conclusion that they presented "no evidence . . . that Stanford negotiated or drafted [the exclusion at issue]"; instead they maintain that the court erred by applying such a narrow version of the exception.[11]

---

[11] The court also observed that because the exclusion at issue "is found in the main body of the form policy, and not in any negotiated endorsement, it appears that the Underwriters drafted that provision."

6

No. 14-10849

But the summary-judgment evidence is also insufficient to create a genuine dispute of material fact under the middle-ground approach. Sewell admitted that he had no knowledge of the "actual negotiation," and his reference to a general negotiation process—without any specifics as to what was actually negotiable—sheds no light on SFGC's actual bargaining power.

Absent any information about the content of the negotiations, how the contracts were prepared, or other indicators of relative bargaining power, Underwriters did not present evidence that the insured did or could have influenced the terms of the exclusion.[12] The district court did not err by declining to apply the exception even if, *arguendo*, it were applicable in Texas.

## III.

Underwriters provided additional evidence of bargaining power in their Rule 59(e) motion, which the district court denied without "expressly or impliedly refer[ring] to the additional materials," such that this court reviews for abuse of discretion. *Templet v. HydroChem Inc.*, 367 F.3d 473, 477 (5th Cir. 2004).[13] We consider: "(1) the reasons for the moving party's default, (2) the importance of the omitted evidence to the moving party's case, (3) whether the evidence was available to the movant before the nonmovant filed the summary judgment motion, and (4) the likelihood that the nonmoving party will suffer unfair prejudice if the case is reopened."[14] Those factors, however, "are simply

---

[12] *Cf. Pittston*, 124 F.3d at 521 (reversing summary judgment and applying the sophisticated-insured exception because "[t]he broker testified in his deposition that he prepared the initial draft of the policies and negotiated the terms with the insurers" such that the "sophisticated insured . . . was heavily involved in the drafting and negotiating of the policies").

[13] Underwriters acknowledge that the abuse-of-discretion standard applies. Brief for Underwriters at 17–18, 30.

[14] *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 445 F.3d 841, 848 (5th Cir. 2006) (quoting *Templet*, 367 F.3d at 482) (internal quotation marks omitted).

## No. 14-10849

illustrative and not exhaustive . . . Rule 59(e) motions provide the district court with 'considerable discretion.'"[15]

With respect to the reasons for default, Underwriters maintain that they had no reason to believe that they needed to provide additional evidence until the time of the district court's order.  Nonetheless, Underwriters would have been on notice before that order—based on the substantial nationwide caselaw applying the sophisticated-insured exception—that they needed to present evidence of SFGC's bargaining power beyond the bare assertion that some negotiation had occurred.

Although the first factor weighs against Underwriters, the second factor weighs in their favor because the omitted evidence is important to the applicability of the exception.  But Underwriters do not suggest that the evidence was unavailable at the time of summary-judgment briefing, such that the third factor weighs against them.  Factor four is neutral; Perraud and Raffanello have not shown that they would suffer unfair prejudice so long as they are given an opportunity to submit evidence of their own.  In light of the factors considered together, the district court did not abuse its considerable discretion by denying the motion.

The judgment is AFFIRMED.

---

[15] *Id.* (alteration in original) (quoting *Templet*, 367 F.3d at 482) (internal quotation marks omitted).

No. 14-10849

KING, Circuit Judge, dissenting:

Underwriters are more than willing to lose this case if only they can persuade this court to make some Texas law on the so-called "sophisticated-insured exception" to the *contra proferentem* rule. All are agreed that no Texas court has spoken on whether such an exception exists, let alone on its content. In order to be in a position to rule on the exception, we have to accept Underwriters' waiver of a challenge to the district court's conclusion that the policy exclusion at issue is ambiguous. That conclusion of ambiguity is a threshold question of law, which we cannot be precluded from reaching. I would resolve this case by concluding that the exclusion unambiguously applies to bar coverage. I would therefore give Underwriters the win which they abjure and decline their request to be the first court to rule on the scope of the sophisticated-insured exception under Texas law. I respectfully dissent.

## I.     Waiver

The majority opines, with zero guidance from Texas courts, on the scope of a sophisticated-insured exception to the rule of *contra proferentem*—the existence of which the majority purports not even to decide. What kind of decision is that? Such judicial gymnastics can easily be avoided here, as the issue the majority resolves becomes germane only if the policy exclusion at issue "is susceptible to more than one reasonable interpretation," i.e., if it is ambiguous. *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 380 (Tex. 2012). The majority does not address this threshold issue of ambiguity. Instead, the majority contends that "Underwriters do not appeal the [district court's] finding of ambiguity," but rather "challenge only the application of the sophisticated-insured exception and the denial of their Federal Rule of Civil Procedure 59(e) motion." Although this is an accurate description of the position taken by Underwriters in their opening brief on appeal, it does not tell the whole story. In their summary judgment briefing below, the parties'

dispute largely revolved around the interpretation of the relevant exclusion, Exclusion J—each side contending that the exclusion is unambiguous and should be interpreted in its favor.[1] And although the district court ruled in favor of Appellees on the basis of the *contra proferentem* doctrine (while rejecting the application of a sophisticated-insured exception), it did so only after first analyzing Exclusion J and deeming it ambiguous. Despite the opening brief's description of the limited scope of Underwriters' appeal, Appellees fully briefed their interpretation of Exclusion J, and in reply Underwriters devoted several pages to their argument that, "by its plain language, Exclusion J was triggered when the Receiver obtained Allen Stanford's voting rights in SFGC." Underwriters reversed course yet again at oral argument, stating that they are not challenging on appeal the district court's conclusion that Exclusion J is ambiguous.

With respect, I would refuse to accommodate what appears to be a strategic effort, on behalf of Underwriters, to have this court create new Texas insurance law, writing on a blank slate. Indeed, the Texas Supreme Court recently declined to address the sophisticated-insured exception for the same reason I would here—because the policy provision at issue is unambiguous. *See In re Deepwater Horizon*, No. 13-0670, 2015 WL 674744, at *13 (Tex. Feb. 13, 2015) ("The [*contra proferentem*] rule comes into play only if there is more than one reasonable interpretation of an insurance policy. Because that is not the situation here, we do not answer the second question [regarding the sophisticated-insured exception]." (internal citation omitted)). Even when faced with what might be called a "friendly suggestion" at oral argument that Exclusion J may unambiguously apply in their favor, Underwriters conceded

---

[1] This appears to be one of the reasons why the evidence relating to the sophisticated-insured exception is so thin.

that they were not making that argument. The only possible motivation for such a concession is to force a ruling on the sophisticated-insured exception—a ruling which will undoubtedly impact Underwriters in future cases.

Underwriters' maneuvering has triggered an opinion as to the scope of the sophisticated-insured exception.[2] Yet "[f]ederal courts are not in the business of rendering advisory opinions." *C&H Nationwide, Inc. v. Norwest Bank Texas NA*, 208 F.3d 490, 493 (5th Cir. 2000). Absent ambiguity, there is no reason for this court to address the contours of the sophisticated-insured exception to the *contra proferentem* rule. We have the discretion to address such a threshold legal issue, despite Underwriters' failure to challenge it in their opening brief. *See U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 445, 447 (1993) (concluding that the D.C. Circuit did not err in addressing a threshold legal issue which "Respondents did not challenge . . . in their opening brief in the Court of Appeals," as "a court may consider an issue antecedent to . . . and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief" (internal quotation marks omitted)); *see id.* at 447 ("The contrary conclusion would permit litigants, by agreeing on the legal issue presented, to extract . . . an opinion that would be difficult to characterize as anything but advisory."); *cf. H & R Block E. Enters., Inc. v. Raskin*, 591 F.3d 718, 723–24 (4th Cir. 2010) (concluding that the court was not bound to accept the parties' stipulation as to a threshold issue that was "unresolved and essential" to the remaining claims, as "the parties were effectively seeking an advisory opinion" on those remaining claims).

---

[2] Thankfully, the opinion is unpublished, and therefore non-precedential. But to take much comfort from that is to overlook the frequency with which unpublished opinions are cited in briefs and elsewhere.

No. 14-10849

Underwriters cannot, in essence, stipulate to the legal question of ambiguity in an attempt to prompt new law on an issue that may not be implicated in this case. *See U.S. Nat'l Bank of Oregon*, 508 U.S. at 448 ("[T]he Court of Appeals acted without any impropriety in refusing to accept what in effect was a stipulation on a question of law."); *Equitable Life Assur. Soc'y of U.S. v. MacGill*, 551 F.2d 978, 983 (5th Cir. 1977) ("[I]t is well settled that a court is not bound to accept as controlling stipulations as to questions of law."); *see also Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) ("[W]here the language is plain and unambiguous, courts *must* enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction." (emphasis added) (internal quotation marks omitted)).

Accordingly, I would not accept Underwriters' strategic attempt to waive the threshold issue of ambiguity. Because I would conclude, for the reasons set out below, that Exclusion J unambiguously applies to preclude coverage in this case, it is unnecessary to address the existence or scope of a sophisticated-insured exception to the *contra proferentem* rule.

## II.    Interpretation of Exclusion J

In my view, Exclusion J, which bars coverage for "any Wrongful Act occurring subsequent to . . . [a]nother entity or individual hold[ing] a majority of the voting rights in the Parent Company," unambiguously applies under the facts of this case.

The "Wrongful Act[s]" at issue here all occurred after the district court, in a separate case, entered an order appointing a Receiver over Stanford and the primary covered entity at issue, SFGC.[3] Under that Receivership Order,

---

[3] Although the Receivership Order does not explicitly name SFGC, it names Stanford himself as a defendant, authorizing the Receiver to "take and have complete and exclusive control, possession, and custody" of all assets and property "and the legally recognized

the Receiver "t[ook] possession of" all of Stanford's assets and property, which necessarily included Stanford's shares in SFGC. The Receivership Order thus had the effect, as a matter of both state and federal receivership law,[4] of granting the Receiver the right to vote the shares of SFGC.[5] SFGC is incorporated under the laws of Florida, and according to Florida law, "[s]hares held by or under the control of a receiver . . . may be voted by him or her without the transfer thereof into his or her name." Fla. Stat. § 607.0721(7). And under the "historical practice in federal courts," Fed. R. Civ. P. 66, a receiver's "authority is wholly determined by the order of the appointing court." *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 98 (2d Cir. 1988); *see Sec. & Exch. Comm'n v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982). The Receivership Order, fairly read, grants the Receiver the authority to vote the SFGC shares by: (1) giving the Receiver possession and control of all "assets, monies, securities, properties . . . and the legally recognized privileges" of SFGC; (2) authorizing the Receiver to "[m]aintain full control of the

---

privileges . . . of the Defendants *and all entities they own or control.*" (emphasis added). Thus, it is clear that, through the Receivership Order, the Receiver took possession and control of SFGC—an entity Stanford "own[ed] or control[led]."

[4] It is unclear which law applies. *Compare* 28 U.S.C. § 959(b) ("[A] . . . receiver . . . appointed in any cause pending in any court of the United States . . . shall manage and operate the property in his possession as such . . . receiver . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."), *and Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 n.11 (5th Cir. 2012) (per curiam) ("The rights of a receiver are determined by state law." (citing 28 U.S.C. § 959(b)), *with* Fed. R. Civ. P. 66 ("[T]he practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule.").

[5] The Receivership Order, which limits the grant of possession and control of "legally recognized privileges" to those "with regard to the entities," does not implicitly except Stanford's right to vote his shares of SFGC. Such a construction of that provision, which likely refers only to Stanford's personal rights, rather than his rights with respect to the entities at issue, would defeat the purpose of granting the Receiver the power to "[m]aintain full control of" those entities and to "[c]ollect, marshal, and take custody, control and possession of" all assets under the control of those entities.

13

No. 14-10849

Receivership Estate;" (3) directing the Receiver to "[c]ollect, marshal, and take custody, control, and possession of all . . . assets of . . . the Receivership Estate;" and (4) granting the Receiver the power to "[p]erform *all acts* necessary to conserve, hold, manage, and preserve the value of the Receivership Estate." (emphasis added). Given the Receiver's authority to vote Stanford's shares in SFGC, the plain language of Exclusion J—which applies when "[a]nother entity or individual holds a majority of the voting rights in [SFGC]"—was triggered by the Receivership Order.

Exclusion J is not rendered ambiguous, as the district court reasoned, because the Receiver merely stood in Stanford's shoes. Although a receiver "stands in the shoes of" the entity or individual over which he maintains control, *Fed. Deposit Ins. Corp. v. Wright (In re Still)*, 963 F.2d 75, 77 (5th Cir. 1992), it is also clear that a receiver is "not an agent of the parties," and is instead "considered to be an officer of the court," 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2981 (2d ed. 2015). In any event, regardless of the exact nature of the relationship between Stanford and the Receiver, the Receiver (and the court, of which the Receiver is an officer) remains "[a]nother entity" from Stanford.

Finally, this result is consistent with the reasoning behind Exclusion J and other such "change in control" provisions: "While the insurer had an opportunity to evaluate the risk presented by the previous management, it does not necessarily have knowledge of the new management and does not wish to automatically extend coverage to the new management." Carrie E. Cope, New Appleman Insurance Law Practice Guide § 37:10[4] (2012); *see also* John F. Olson, et al., Director & Officer Liability: Indemnification and Insurance § 12:41 (2014). The Receivership Order here granted the Receiver full management powers over SFGC, including the power to "retain or remove, as the Receiver deems necessary or advisable, any officer, director,

14

No. 14-10849

independent contractor, employee, or agent of [SFGC]." In issuing the policies, the Underwriters had not bargained for risks relating to new management the Receiver may bring in—the very concern underlying these exclusions.[6]

*\*\**

Accordingly, because Exclusion J unambiguously applies under the facts of this case, it is unnecessary to address the application of the *contra proferentem* rule. As I would reverse and render judgment in favor of Underwriters, I respectfully dissent.

---

[6] Two other arguments raised by the district court merit only brief responses. First, the district court reasoned that the application of Exclusion J in this case is inconsistent with a separate provision in the policies "expressly contemplat[ing] that [the policies] would remain in force if a bankruptcy trustee were appointed for R. Allen Stanford." But that provision merely defines Directors and Officers to include their estates in the event of bankruptcy. The two provisions do not conflict because even after the appointment of a receiver or bankruptcy trustee, the policies remain in effect with respect to "Wrongful Act[s]" committed prior to the appointment. Second, the district court suggested that Exclusion J may be void as an *ipso facto* clause contrary to public policy. Even if Exclusion J could be considered an *ipso facto* clause, given that it arguably has the effect of modifying the insurance policies upon appointment of a receiver, it is not void as contrary to public policy. In reaching the opposite conclusion, the district court relied on two inapposite statutes addressing *ipso facto* clauses in the bankruptcy and FDIC contexts. But there do not appear to be any statutes or cases indicating that Congress disfavors *ipso facto* clauses in the context of an SEC receiver. *See Fid. & Deposit Co. of Md. v. Conner*, 973 F.2d 1236, 1241 (5th Cir. 1992) ("Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (internal quotation marks omitted)). Moreover, there do not appear to be any Texas cases—and neither the district court nor Appellees have cited any—disfavoring *ipso facto* clauses in *any* context.