# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 4, 2010

No. 09-51006

Lyle W. Cayce
Clerk

CORNELE A. OVERSTREET, Regional Director of Region 28 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,

Plaintiff-Appellee

v.

EL PASO DISPOSAL, L.P.,

Defendant-Appellant

Appeal from the United States District Court for
the Western District of Texas

Before SMITH, WIENER, and ELROD, Circuit Judges.

WIENER, Circuit Judge:

Following union certification, thirteen months of bargaining, and a strike, Plaintiff-Appellee the National Labor Relations Board ("the NLRB" or "the Board") filed charges of unfair practices against Defendant-Appellant El Paso Disposal ("EPD"). The NLRB also filed a petition in the district court for temporary injunctive relief, seeking to force EPD to (1) cease and desist from alleged unfair labor practices, (2) recognize and bargain in good faith with the certified union, (3) rescind unlawful unilateral changes in working conditions, and (4) offer to reinstate the former strikers. The NLRB filed for this injunction

No. 09-51006

pursuant to its authority under § 10(j) of the Labor Relations Management Act ("the Act"). The district court granted the injunction. EPD appeals the injunction, contesting (1) the court's determination that it engaged in bad-faith bargaining in relation to Dues Check-Off, and (2) the court's order to reinstate the striking workers to the same or equivalent employment. We affirm.

## I. Facts & Proceedings

*A. Facts*

EPD is a garbage collection and disposal company incorporated in Texas with its principal place of business in El Paso. The International Union of Operating Engineers, Local 351, AFL-CIO (the "Union") was certified as the exclusive bargaining representative for EPD's Maintenance Unit employees on Sept 28, 2006, and for EPD's Drivers Unit employees on October 12, 2006. Between these dates— on October 2, 2006— the Union sent an official notice to EPD demanding that it bargain with the Maintenance Unit employees.

The first negotiating session occurred late in January 2007. Between that time and late November 2007, the Union and EPD held fourteen bargaining sessions, each of which lasted for about five hours. It was difficult to schedule these sessions because the attorney for EPD only had authority to speak on behalf of EPD and not to enter into agreements without a management official present.

The parties first attempted to address the non-economic issues. As of August 9, 2007, four non-economic issues remained unresolved: (1) Grievance/Arbitration, (2) No Strike/No Lockout, (3) Management Rights, and (4) Dues Check-Off. The Union had proposed the Dues Check-Off clause in the first bargaining session held in January 2007. In May 2007, the Union offered to accept the Management Rights clause if EPD would accept the Union's Dues Check-Off clause. This offer was reiterated to EPD by the Union on May

2

31, 2007. EPD rejected this offer without explanation and never submitted a written counterproposal to the Union on this issue.

In September 2007, the Union informed EPD that its members had voted unanimously to strike. The parties decided to change the focus of negotiations from the remaining non-economic issues to the economic proposals. Early in October 2007, after continuing to discuss the Union's economic proposals, the parties agreed that Gene Dupra, a management official for EPD, would meet with the employees and ask prepared and approved questions about the employees' concerns, EPD's performance, and the Union. Duprea told some employees that he would discuss the employees' concerns with his supervisors. During the negotiations, EPD made unilateral work policy changes. These included (1) requiring an employee to supply a doctor's note to use sick leave after a holiday, (2) transferring an employee from one driver position to another, with a change in pay rate from hourly to incentive, and (3) suspending its longevity bonus (a watch after ten years of service) for one employee.

At a meeting about a month later, EPD stated its belief that sufficient progress had been made for it to present a "last, best, and final offer" at the next meeting. The Union disagreed because both Dues Check-Off and Grievance/Arbitration remained to be settled. EPD nevertheless presented its last, best, and final offer to the Union in November 2007. That offer consisted of thirty-two articles, of which only twenty-three had been mutually agreed on previously. The non-agreed articles included Management Rights, Holidays, Sick Leave, Uniform, Fringe Benefits, Grievance/Arbitration, No Strike/No Lockout, Wage Increase, and Longevity Bonuses. The Management Rights provision would grant EPD discretion in setting workplace rules, as well as disciplining, discharging, subcontracting, and laying-off employees. A federal mediator delivered the Union's counter offer on several of the articles to EPD, most of which EPD refused to accommodate.

After that meeting, but on the same day, the Union held a general meeting with the employees of the Maintenance and Drivers Units. The Union negotiator told the employees that EPD "wasn't willing to budge" on the Union's proposals. He then explained the difference between an economic strike and an unfair labor practices strike, and he stated that the Union would be filing an unfair labor practices charge against EPD. The Union members then voted unanimously to begin a strike on November 21, 2007.

That meeting was held on November 13, 2007. At 4 a.m. the next morning, EPD held a mandatory meeting for the drivers; no Union representative was present. EPD summarized its final offer for the Maintenance Unit and told the drivers that the proposed contract was for both units. EPD then informed the drivers that if they joined the maintenance strike, they would be permanently replaced. Prompted by a question from an employee, EPD explained how to get rid of the Union. EPD then called a meeting with the Maintenance Unit for November 20, 2007 to inform those employees that any of them who struck would be permanently replaced.

The strike began at 12:01 a.m. on November 21, 2007. A total of fifty-five workers from one or the other units joined the picket line in front of EPD's facility. The next day, EPD called the El Paso Police Department to complain that the picketers were obstructing motorists' vision and to request that the police send officers to the picketers' location. EPD began hiring replacement employees that day; by the end of the week EPD had replaced all striking workers.

Early in December 2007, the Union made an unconditional offer to return to work. EPD rejected the offer the next day and informed the Union that it considered the strike to be an economic one, that all strikers were permanently replaced, and that no vacancies existed. EPD did create a preferential hiring list of striking workers, onto which all but three of the striking workers signed. By

the middle of May 2008, however, only two striking workers had been offered re-employment; five replacement mechanics had left EPD. Also, two welding positions came open in May, but these were not offered to any of the striking workers. And, even though EPD discharged fifteen of its replacement drivers, it did not offer any of these positions to striking workers. The few strikers hired from the preferential hire list were treated as new hires: They were required to fill out paperwork as if they were new hires, were offered lower wages, and were denied longevity bonuses, such as a certificate of appreciation and a check for $2,000 for fifteen years of service.

In mid-December 2007, fifty drivers signed a petition declaring that they no longer wished to be represented by the Union. In December 2008, EPD received two more disavowal petitions, both from the Maintenance Unit, with twenty-seven signatures on each. Prior to that month, one driver filed a decertification petition with the NLRB seeking to decertify the Union as the bargaining representative of the Drivers' Unit.

In March 2009, EPD granted its first wage increase in three years to the employees in the bargaining Units. Incentive-based and non-striking drivers received a 6.2 percent pay increase, and hourly replacement drivers received a 3.2 percent increase. EPD neither notified the Union prior to granting these increases nor provided the Union an opportunity to bargain over these increases.

In April 2009, an Administrative Law Judge (ALJ) issued a decision on six charges that had been filed by the Union with the NLRB between November 2007 and March 2008. The ALJ generally agreed with the Union that EPD had violated the Act in many ways, including bad faith bargaining and dilatory negotiating practices. The ALJ ruled that the strike was an unfair labor practices strike and that the December 2007 disavowal petitions were tainted by EPD's unfair labor practices. A different ALJ heard testimony on three

No. 09-51006

subsequent charges filed with the NLRB between November 2009 and March 2009.

*B. Proceedings*

Plaintiff-Appellee, Cornele Overstreet, the Regional Director of the NLRB, filed an administrative complaint against EPD late in January 2008. In it, he alleged that EPD had engaged in unfair labor practices under the Act in violation of § 8(a)(1) and (5).[1] At the end of April 2008, Overstreet filed another administrative complaint against EPD, this one alleging unfair labor practices, including practices relating to the strike and the failure to reinstate strikers after the Union terminated the strike in December 2007. After EPD responded to these two complaints, the ALJ issued a recommended decision and order in April 2009, to which both parties filed exceptions. These matters are still pending before the NLRB. Overstreet filed two other administrative complaints that year, one in February and the other in May. Hearings on these complaints were held in August 2009 and are still pending before the NLRB.

In July 2009, following issuance of an administrative complaint and pursuant to § 10(j) of the Act, Overstreet filed the instant petition for injunctive relief in the district court. EPD challenged the petition and moved to dismiss for lack of subject matter jurisdiction. After conducting a hearing, the district court denied EPD's motion to dismiss and granted Overstreet's temporary injunction, which required EPD to offer the striking workers immediate reinstatement and ordered EPD to recognize the Union and resume bargaining. EPD timely filed a notice of appeal. In December 2009, this court denied a motion to stay the injunction.

---

[1] 29 U.S.C. § 158(a)(1), (5) (2010).

No. 09-51006

## II. Analysis

*A. Standard of Review*

We review the district court's determinations of subject matter jurisdiction *de novo*.[2] When we review injunctive relief under § 10(j), we conduct a sequential two-party inquiry: (1) whether the Board, through its Regional Director, has "reasonable cause" to believe that unfair labor practices have occurred, and (2) if they did, whether injunctive relief is "just and proper."[3] A district court need only decide that the NLRB's theories of law and fact are neither insubstantial nor frivolous to rule that the Board had reasonable cause.[4] We review the district court's factual determinations for clear error and its legal conclusions *de novo*.[5] We review whether injunctive relief is just and proper under an "abuse of discretion standard."[6]

EPD urges that we should employ the traditional four-part equitable test for injunctive relief, or at least require a showing of irreparable harm, when we evaluate the propriety of injunctive relief under § 10(j).[7] We have said, however, that "[al]though traditional rules of equity may not control the proper scope of § 10(j) relief, some measure of equitable principles come [*sic*] into play."[8] This

---

[2] *Zolicoffer v. United States Dep't of Justice*, 315 F.3d 538, 540 (5th Cir. 2003); *United States v. Tex. Tech. Univ.*, 171 F.3d 279, 288 (5th Cir. 1999).

[3] *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1188-89 (5th Cir. 1975).

[4] *Id.* at 1189.

[5] *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 463 (5th Cir. 2003).

[6] *Pilot Freight Carriers,* 515 F.2d at 1192.

[7] EPD notes that other circuits, such as the First, Fourth, Seventh and Ninth Circuits, employ a four-part test; the Sixth Circuit, on the other hand, employs the same 'reasonable cause/just and proper' standard as we do.

[8] *Pilot Freight Carriers,* 515 F.2d at 1192-93.

No. 09-51006

is because "[s]ection 10(j) is itself an extraordinary remedy"[9] that must be used sparingly and then only when the NLRB, in its discretion, is concerned that either a employer or an union has committed such unfair labor practices that any final order of the NLRB would be meaningless and the remedial purposes of the Act will be frustrated without an injunction to preserve the status quo.

A requirement, such as proposed by EPD, to make the NLRB show "irreparable harm" and "likelihood of success" for § 10(j) relief would raise the factual threshold that the NLRB must reach.[10] Nothing in *Pilot Freight Carriers*, or in our case law, supports replacing the test we currently use with a hybrid that incorporates the traditional four-part test for equitable relief. Although the principles of equity inform an evaluation for § 10(j) relief, the two part *Pilot Freight Carriers* test remains the clear operative test for evaluating such relief.[11]

---

[9] *Id.* at 1192.

[10] The test outlined in *Pilot Freight Carriers* almost undoubtedly does not require such a heightened factual threshold. The Eleventh Circuit, employing *Pilot Freight Carriers* as its precedential authority, held on the issue of the factual threshold necessary for § 10(j) relief:

> We now make it clear that in order to prove reasonable cause, the Board must present enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board.

*Arlook ex rel. NLRB v. S. Lichtenberg & Co.,* 952 F.2d 367, 371 (11th Cir. 1992). This threshold is significantly lower than a requirement to show 'irreparable harm' and 'likelihood of success'.

[11] Indeed, the most we have said on the matter is "though traditional rules of equity may not control the proper scope of § 10(j) relief, some measure of equitable principles come [*sic*] into play." *Pilot Freight Carriers*, 515 F.2d at 1192-93. In light of our silence on the issue after *Pilot Freight Carriers* as well as the Eleventh Circuit's holding, based on the same case, that the Board must show only a minimal burden of proof, *Arlook,* 952 F.2d at 371, we are satisfied that the *Pilot Freight Carriers* test should not be modified in this case, even if we were free to do so under our rule of orderliness.

No. 09-51006

*B. Subject Matter Jurisdiction*

EPD contends that the district court lacked subject matter jurisdiction under § 10(j) to issue the injunction because the petition was neither considered nor authorized by the NLRB.  Alternatively, EPD claims that the district court lacked subject matter jurisdiction because the NLRB has not had a quorum since January 1, 2008, as a result of which the General Counsel had no authority to petition the court for an injunction under § 10(j).

Section 10(j) of the Act states that the Board:

> shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.[12]

None questions that the NLRB has the power to request a § 10(j) injunction.  In this case, however, it was the General Counsel, not the NLRB, who requested the injunction.  The NLRB had delegated its § 10(j) authority to the General Counsel, effective December 28, 2007.  The Act creates the position of General Counsel for the Board and states that the General Counsel "shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law."[13]

---

[12] 29 U.S.C. § 160(j).

[13] *Id.* § 153(d).

No. 09-51006

A general limitation on the ability of the Board to delegate duties to the General Counsel lies in the distinction between prosecutorial duties and adjudicatory functions. EPD attempts to frame the Board's petition power under § 10(j), and the decision whether to pursue § 10(j) relief, as an adjudicatory function. Petition power under § 10(j) is prosecutorial in nature, however, despite the fact that it includes the decision to seek an injunction. Other courts have held that the NLRB may delegate only prosecutorial duties, and not adjudicatory functions, to the General Counsel.[14] Every court that has considered the question whether the Board may delegate petition power to the General Counsel under § 10(j) has held that it may do so.[15] As the Fourth Circuit noted in *Muffley*, seeking injunctive relief is prosecutorial because it is the district court, and not the General Counsel, that ultimately grants or denies relief after adjudicating the petition.[16] The Board may delegate its petition power under § 10(j) to the General Counsel, so the district court was within its jurisdiction to consider Overstreet's petition for an injunction in this case.

In its alternative contention, EPD insists that the district court lacks subject matter jurisdiction because the Board did not have the required quorum of members at all relevant times and was thus without the power to delegate. Noting that § 153(b) sets a quorum at three members of the Board, and that the

---

[14] *Muffley ex rel. NLRB v. Spartan Mining Co.*, 570 F.3d 534, 540 (4th Cir. 2009); *Flav-O-Rich, Inc. v. NLRB*, 531 F.2d 358, 363-64 (6th Cir. 1976); *KFC Nat'l Mgmt. Corp. v. NLRB*, 497 F.2d 298, 306-07 (2d Cir. 1974).

[15] *Muffley,* 570 F.3d at 540 ("*seeking* § 10(j) relief from a district court adjudicates nothing"); *Kentov ex rel. NLRB v. Point Blank Body Armor, Inc.,* 258 F. Supp. 2d 1325, 1329 (S.D. Fla. 2002); *Penello v. Int'l Union, UMWA*, 88 F. Supp. 935, 937 (D.D.C. 1950); *Evans v. Int'l Typographical Union*, 76 F. Supp. 881, 888-89 (S.D. Ind. 1948).

[16] *Muffley,* 570 F.3d at 539-40.

plain language of § 153(b)[17] mandates that a quorum of the Board exists only when there are at least three sitting members, EPD reasons that the General Counsel's delegated authority ceases during any periods that the Board's membership is fewer than three. To support this proposition, EPD cites the D.C. Circuit's recent decision in *Laurel Baye Healthcare, Inc. v. NLRB*,[18] wherein that court held that when the Board's membership drops to two, it loses its quorum and "[i]n the context of a board-like entity, a delegee's authority therefore ceases the moment the vacancies or disqualifications on the board reduce the board's membership below a quorum."[19]

The Supreme Court, however, recently decided *New Process Steel, L.P. v. NLRB*,[20] which implicated this issue. The Court held that when only two members of a three-member delegee group remain, there is not a quorum and the group loses the authority delegated to it by the Board.[21] Despite similar holdings, the Court explicitly declined to endorse the holding and reasoning of *Laurel Baye*.[22] Instead, on the question whether a delegee who is not a member

---

[17] The relevant language reads:

A vacancy in the Board shall not impair the right of the remaining members to exercise all of the power of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board, except that two members shall constitute a quorum of any group designated pursuant to the first sentence hereof.

29 U.S.C. § 153(b).

[18] 564 F.3d 469 (D.C. Cir. 2009), *cert. denied*, 130 S. Ct. 3498 (2010).

[19] *Id.* at 473.

[20] 130 S. Ct. 2635 (2010).

[21] *Id.* at 2644.

[22] *Id.* at 2643 n.4 ("[W]e do not adopt the District of Columbia Circuit's equation of a quorum requirement with a membership requirement that must be satisfied or else the power of any entity to which the Board has delegated authority is suspended.").

of the Board may continue to function after the Board's membership dips below three, the Court stated:

> Nor does failure to meet a quorum requirement necessarily establish that an entity's power is suspended so that it can be exercised by no delegee.   The requisite membership of an organization, and the number of members who must participate for it to take an action, are two separate (albeit related) characteristics. . . .Our conclusion that the delegee group ceases to exist once there are no longer three Board members to constitute the group does not cast doubt on the prior delegations of authority to nongroup members, such as the regional directors or the general counsel. The later implicates a separate question that our decision does not address.[23]

In light of the Court's pronouncement in *New Process Steel*, we feel no compulsion to follow *Laurel Baye*.

When, on December 28, 2007, the NLRB delegated its § 10(j) power to the General Counsel, the five-person board consisted of four members; there was but one vacancy.   Then, on December 31, 2007, several days after that delegation, two of the Board's four remaining members' terms expired.   For a significant time, therefore, the NLRB comprised only two members (currently, the Board is at its full strength of five members and has ratified the December 28, 2007 delegation of § 10(j) power to the General Counsel).  Nevertheless, the operative fact here is that, at the time of its delegation to the General Counsel, the Board comprised the requisite number of members to constitute a quorum.  The fact that Board membership subsequently dipped below a quorum does not retroactively invalidate the Board's prior delegation.[24]  Therefore, the General

---

[23] *Id.*

[24] *See Teamsters Local Union No. 532 v. NLRB*, 590 F.3d 849 (10th Cir. 2009), *abrogated in part by New Process Steel*, 130 S. Ct. 2635; *Narricot Indus., L.P. v. NLRB*, 587 F.3d 654, 658-60 (4th Cir. 2009), *cert. dism'd*, 79 U.S.L.W. 3015, *and cert. dism'd*, 79 U.S.L.W. 3016 (U.S. Sept. 16, 2010); *New Process Steel, L.P. v. NLRB*, 564 F.3d 840 (7th Cir. 2009), *rev'd on other grounds*, 130 S. Ct. 2635 (2010); *Snell Island SNF L.L.C. v. NLRB*, 568 F.3d 410 (2d

No. 09-51006

Counsel retained the § 10(j) power, despite fluctuations in the membership of the Board.

## C. The Grant of Injunctive Relief

The district court granted the injunction sought by the Board and ordered that all fifty-five workers who were participating in the unfair labor practices strike be reinstated.  Although the EPD contests this grant of temporary injunctive relief, we conclude that the district court did not abuse its discretion in mandating that EPD reinstate those striking workers.

The district court employed the two-prong test from *Pilot Freight Carriers*. As we noted above, this inquiry, and not a hybridization with a traditional four-part equity inquiry, is the correct test to use when considering a § 10(j) petition. When it did so, the district court determined that the strike was an unfair labor practices strike, not an economic one.  Strikers in an unfair labor practices strike are entitled to immediate reinstatement to their former positions or to back pay on an unconditional offer to work.[25]  The fact that EPD hired replacements does not affect the entitlement of unfair labor practices strikers to return to work.[26] As the district court determined that this was an unfair labor practices strike, the Union and the strikers had "reasonable cause" to believe that EPD violated § 8(a)(1) and (3) of the Act by not reinstating the strikers when they unconditionally offered to be reinstated.

---

Cir. 2009), *abrogated in part on other grounds by New Process Steel*, 130 S. Ct 2635; *Ne. Land Servs., Ltd. v. NLRB*, 560 F.3d 36 (1st Cir. 2009), *abrogated in part on other grounds by New Process Steel*, 130 S. Ct. 2635.

[25] *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278 (1956).

[26] *In re Nortech Waste & Operating Eng'rs Local Union No. 3,* 336 N.L.R.B. 554, 565 (2001).

No. 09-51006

EPD nevertheless insists that there is no "reasonable cause" supporting the district court's conclusion that the strike was an unfair labor practices strike. EPD argues that (1) the record does not support the contention that EPD engaged in bad faith bargaining, and (2) even if there is some evidence of bad faith, there is no causal linkage between such evidence and the strike.

To the contrary, the record contains evidence that EPD did engage in bad faith bargaining. For example, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."[27] Both parties are required to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder."[28] We will sustain a determination of bad faith as long as we "find[] support in the record as a whole . . . even though the court would justifiably have made a difference choice had the matter been before it *de novo*."[29]

The record contains a significant amount of evidence which suggests that EPD failed to meet its responsibilities as a negotiating partner. It did not meet at reasonable times, delayed the initial bargaining session for four months, and refused to negotiate for more than five hours a day. EPD's representatives often left those meetings early to catch flights out of town and attended only fourteen bargaining sessions over a thirteen-and-one-half month period (for a total bargaining time of sixty hours). In addition, EPD refused to schedule sessions with the Union unless all three negotiators could attend, and EPD failed to negotiate in good faith by refusing to negotiate the Dues Check-Off provision,

---

[27] 29 U.S.C. § 158(a)(5).

[28] *Id.* § 158(d).

[29] *Huck Mfg. Co. v. NLRB,* 693 F.2d 1176, 1187 (5th Cir. 1982) (citations and internal quotation marks omitted).

which is a mandatory subject of bargaining under the Act.[30]  Further, EPD insisted on offering a last, best, and final offer after only two meetings to negotiate economic issues and no discussion relating to longevity bonuses. Lastly, EPD refused to consider the bulk of the Union's counter to EPD's final offer.  EPD's conduct away from the bargaining table was no better.[31]  As further evidence of its bad faith, EPD instituted changes to working conditions unilaterally and conducted unilateral interviews with employees.  When we consider all the totality of the evidence in the light most favorable to the Board, we perceive more than "reasonable cause" for the Board to conclude that EPD engaged in bad faith bargaining.

Contrary to EPD's assertions, the record reflects evidence of a causal link between EPD's bad faith bargaining and the strike.  If the Board shows that "an unfair labor practice is a 'contributing cause' of a strike, then as a matter of law, the strike must be considered as an unfair labor practice strike."[32]  Morever, the Board's evidentiary burden is low because as long as "an unfair labor practice had anything to do with causing the strike, it was [and will be considered by the court] an unfair labor practice strike."[33]  A causal connection, however, must be more than employees' mere awareness of the protected status afforded to unfair labor practices strikers.[34]  Nevertheless, the burden is on the employer to show

---

[30] *See Sweeney & Co. v. NLRB*, 437 F.2d 1127, 1134-35 (5th Cir. 1971) (quoting *United Steelworkers of America v. NLRB,* 390 F.2d 846, 849 (D.C. Cir. 1967)).

[31] Conduct away from the bargaining table is relevant to a determination of bad faith bargaining.  *See In re Hardesty Co.,* 336 N.L.R.B. 258, 259 (2001), *enforced,* 308 F.3d 859 (8th Cir. 2002).

[32] *NLRB v. Pope Maint. Corp.*, 573 F.2d 898, 906 (5th Cir. 1978) (quoting *NLRB v. Colonial Haven Nursing Home, Inc.*, 542 F.2d 691, 704 (7th Cir. 1976)).

[33] *NLRB v. Cast Optics Corp.,* 458 F.2d 398, 407 (3d Cir. 1972) (citation omitted).

[34] *See Id.*

that the strike would have occurred even if it had not committed unfair labor practices.[35]

In the instant case, there was employee testimony before the ALJ that both economics and unfair labor practices caused the strike. At two separate Union meetings, employees expressed frustration at the slow pace of negotiations. In response, the Union representative explained during the meeting at which the strike was declared that he believed the strike to be an unfair labor practices strike. In addition, Union picketers and representatives consistently maintained that the strike was an unfair labor practices strike. As the Board has met its minimal burden of showing a causal link between the strike and unfair labor practices, we conclude that the district court did not abuse its discretion in finding that such a connection existed.

Neither did the district court abuse its discretion when, under the second prong of the *Pilot Freight Carriers* test, it determined that the remedy of reinstatement was "just and proper." Ordinarily, courts properly leave the decision whether to reinstate strikers to the Board.[36] The Board's remedial process may be effective even if the district court does not grant an injunction ordering reinstatement.[37] In exceptional cases, however, the district court may employ an injunction ordering reinstatement, so as to prevent the destruction of employee interest in collective bargaining, irreparable injury to the union's bargaining power, and the undermining of the effectiveness of any resolution through the Board's process.[38]

---

[35] *See Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814, 820 (6th Cir. 1975).

[36] *Pilot Freight Carriers,* 515 F.2d at 1192.

[37] *See, e.g.*, *Pascarell ex rel. NLRB v. Vibra Screw, Inc.,* 904 F.2d 874, 878-79 (3d Cir. 1990).

[38] *Pye ex rel. NLRB v. Excel Case Ready*, 238 F.3d 69, 74-75 (1st Cir. 2001).

No. 09-51006

One potential problem here is the time that has elapsed between the strike and any potential reinstatement. In *Pilot Freight Carriers,* we refused to hold that the district court had abused its discretion when it refused to order reinstatement.[39] The district court in that case justified its reluctance to grant such an injunction on the fact that the Board's delay of three months in seeking injunctive relief after discharge demonstrated that harm had already been incurred and reinstatement thus would serve no purpose.[40] Other circuits, however, have affirmed grants of reinstatement to preserve the status quo ante pending the Board's decision.[41] Even though in *Muffley*, eighteen months elapsed between the employee's discharge and the filing of the petition, the district court was not held to have abused its discretion when it concluded the delay was reasonable, especially given the Board's need to wait for the ALJ to make a decision in that complex case.[42] Because the ALJ's fact finding here aided the district court's adjudication of Overstreet's petition, delay alone is not dispositive.

Other factors support the conclusion that the district court did not abuse its discretion in granting injunctive relief and ordering reinstatement of the strikers. The ALJ found, and the district court agreed, that EPD's discharge of the strikers and failure to reinstate them was a direct cause of the anti-Union sentiment among the workers that led to several petitions to decertify the Union as the workers' representative. As EPD still had not reinstated thirty-two of the

---

[39] 515 F.2d at 1193.

[40] *Id.*

[41] *NLRB v. Electro-Voice, Inc.,* 83 F.3d 1559, 1573 (7th Cir. 1996); *Angle v. Sacks ex rel. NLRB*, 382 F.2d 655, 661 (10th Cir. 1967). *See also Muffley ex rel. NLRB v. Spartan Mining Co.,* 570 F.3d 534, 544-45 (4th Cir. 2009) (concluding that an 18 month delay between discharge and reinstatement was "troubling" but outweighed by other factors and affirming a grant of reinstatement).

[42] *Accord Muffley*, 570 F.3d at 544 (noting same).

fifty-five striking workers, the district court found that a "large nucleus" of Union support had been replaced because of EPD's failure to reinstate.[43] Of the eleven Union strikers who were recalled, six had signed the disavowal petition. These findings of fact, which are not clearly erroneous, support the district court's order of reinstatement as necessary to avoid severely diminishing Union support and, with it, the ability of the Union to negotiate with EPD. Reinstatement preserves the status quo by returning the workforce to pre-strike level of Union support. Finally, a refusal to reinstate in this case would merely reward EPD for its unfair labor practices, as it would gain a benefit from its decision to deny the right of unfair labor practices strikers to be reinstated after they stop striking.

The evidence in the record demonstrates that the court did not abuse its discretion in holding that reinstatement was "just and proper" and equitably necessary: Reinstatement restores the status quo ante as intended by § 10(j).

## D.  Dues Check-Off

EPD claims that the district court erred by ordering it to adopt the Union's proposed Dues-Check off provision.  The court's order states:

[EPD] 1.  Enjoined and Restrained from:

. . .

> (b) Engaging in bad-faith bargaining, including engaged in dilatory tactics regarding the scheduling of bargaining sessions, failing and refusing to meet regularly with the Union at reasonable intervals, unreasonably limiting the duration of negotiating sessions, failing to designated an agent with sufficient bargaining authority, **refusing to accede to a Dues Check-Off provision,** and presenting premature final offers to the Union:. . . .

---

[43] *See Bloedorn ex rel. NLRB v. Francisco Foods, Inc.,* 276 F.3d 270, 298 (7th Cir. 2001) (refusing to reinstate strikers sends an "unmistakable message" that Union support jeopardizes employment).

EPD is correct that the Board cannot remedy bad faith bargaining by compelling a party to change its position or agree to a specific proposal.[44]  And, the Board concedes that the district court may not order a party to agree to a bargaining proposal.  In this context, the order's use of "accede" creates a requirement that EPD accept the Dues Check-Off provision offered by the Union, which is beyond the power of the district court to require.

It is likely that the district court merely copied the ALJ's draft of the proposed order—which included the same language—without closely considering the implications of using the word "accede" in this context. We assume that the court intended to enjoin EPD from continuing to refuse to *negotiate* the Dues Check-Off provision, which is within the powers of the district court and the Board to compel.  Therefore, we modify the court's injunction[45] by replacing "accede to" with "negotiate," and we affirm the injunction as thus modified.

### III.  Conclusion

Injunctions in cases such as this are rare, as they should be.  This, however, is one of those rare instances when an injunction is appropriate, given the actions of EPD.  The district court did not abuse its discretion when it granted an injunction to reinstate workers because it had reasonable cause to believe that EPD had violated— and was continuing to violate— the Act, and that it was necessary to grant the injunction to maintain the status quo ante. The court was also well within its discretion to order EPD to negotiate Dues

---

[44] *H.K. Porter Co. v. NLRB,* 397 U.S. 99, 108 (1970).

[45] A panel has the power to modify an injunction.  *See Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 576 (5th Cir. 2010) ("We modify the district court's injunction consistent with this opinion . . . .").

No. 09-51006

Check-Off with the Union.  As modified, the orders of the district court appealed from herein are, in all respects, AFFIRMED.