# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 13, 2015

Lyle W. Cayce
Clerk

No. 14-30839

M. KATHLEEN MCKINNEY, Regional Director of Region Fifteen of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,

>    Plaintiff - Appellee

v.

CREATIVE VISION RESOURCES, L.L.C.,

>    Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, HIGGINBOTHAM, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal presents the question of whether a district court abuses its discretion by granting injunctive relief under § 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(j), absent specific findings that the enjoined conduct was egregious or otherwise exceptional. M. Kathleen McKinney, the National Labor Relations Board's regional director, sought and obtained a temporary injunction requiring Creative Vision Resources, L.L.C.,

No. 14-30839

to negotiate and bargain in good faith with a labor union.[1]  Creative Vision appeals the district court's grant of injunctive relief, arguing that such relief was not equitably necessary under the circumstances of this case.

We conclude that the district court abused its discretion because it ordered injunctive relief supported only by general findings of harm that do not evince exceptional or egregious conduct or harms in the context of the NLRA.  Nor did the district court address adequately the effect of the excessive passage of time between the onset of the alleged wrongful activities and the issuance of the injunction.  The district court's order enjoined conduct in 2014 in an attempt to preserve a status quo as it existed in 2011.  Because we conclude that the district court's findings are insufficient, we VACATE the district court's order issuing injunctive relief and REMAND the case.

I.

The relevant facts in this case are materially undisputed and relate to a work force of "hoppers," persons who work on the back end of garbage trucks. The hoppers here are supplied by appellant Creative Vision to a waste disposal company called Richard's Disposal, Inc., in New Orleans, Louisiana.

In August 2005, Richard's entered into a contract with a company called Berry to provide hoppers for its garbage trucks.[2]  Local 100, Service Employees International Union ("SEIU"), a labor union, represented Berry's hoppers in their collective bargaining agreements between 2007 and 2009.  Local 100

---

[1] Although McKinney filed the petition and is technically listed as the Plaintiff-Appellee in this case, she took action on behalf of the National Labor Relations Board. Accordingly, we treat the National Labor Relations Board as the Plaintiff-Appellee and refer to it as "the NLRB" or "the Board" herein.

[2] "Berry" actually refers to a number of different business entities.  The district court treated them as a single entity, however, and we do the same.

2

disaffiliated from SEIU in October 2009, but it continued to represent the hoppers as Local 100, United Labor Unions.[3]

In 2010, Alvin Richard III, the son of the owner of Richard's and an executive of Richard's, formed Creative Vision, apparently to provide hoppers to Richard's. Creative Vision distributed hiring applications to the Berry hoppers who worked for Richard's in May 2011, and on June 1, 2011, Richard's informed Berry that it no longer needed Berry's services. Beginning on June 2, 2011, Creative Vision supplied the hoppers for Richard's garbage trucks. Creative Vision employed the same hoppers as Berry—at least forty-three of the forty-four hoppers had been employed by Berry and had been represented by Local 100.

After Creative Vision began servicing Richard's trucks, Local 100 contacted Creative Vision, asking that it recognize and bargain with Local 100 as the exclusive representative of Creative Vision's hoppers. According to Local 100, Creative Vision is a successor to Berry, and, as such, Creative Vision is required to bargain with the union. Local 100 claims that Creative Vision refused to recognize or bargain with it, and it filed an unfair labor practice charge against Creative Vision on June 17, 2011, alleging violations of the NLRA. The NLRB investigated and issued an administrative complaint against Creative Vision on March 30, 2012. The parties then prepared for a trial on the allegations before an administrative law judge ("ALJ").[4]

On July 25, 2012, however, the NLRB also filed a petition for injunctive relief in the federal district court. In the petition, the NLRB sought to enjoin Creative Vision to recognize and bargain in good faith with Local 100 based on

---

[3] From the hoppers' perspective, their relationship with the union was largely unchanged as a result of the disaffiliation.

[4] During this time, the NLRB points out that the parties also engaged in settlement negotiations.

the allegations before the ALJ.  The petition lingered in the federal district court for almost two years.

While the petition was pending in the district court, a number of events occurred in the administrative proceedings before the NLRB.  The ALJ issued a decision siding with the NLRB on some of the claims against Creative Vision on January 7, 2013.  The district court placed the ALJ's decision into the record on January 24, 2013.  Creative Vision and the NLRB filed exceptions to the ALJ's ruling, and, as far as the record before us shows, that ruling is currently pending before the NLRB for decision.

After the ALJ issued his ruling, the NLRB filed a motion in the district court on February 19, 2013, seeking an expedited ruling on the petition for the § 10(j) injunction.  At the same time, however, Creative Vision moved to dismiss the petition, arguing that injunctive relief was now a moot point in the light of the protracted delay in pursuing injunctive relief.  On September 9, 2013, the district court denied both the motion to expedite and the motion to dismiss, leaving the petition for injunctive relief pending before the district court.  After these rulings, the district court took no further action until July 8, 2014, when it granted the petition and entered an injunction, enjoining Creative Vision to recognize and bargain with the union.  It concluded that an injunction was needed to preserve the status quo ante in anticipation of the NLRB's ultimate decision on the merits of the case.  Creative Vision filed this timely appeal, challenging the district court's order granting the injunction under § 10(j) of the NLRA.

No. 14-30839

## II.

### A.

#### 1.

As this case involves a claim for injunctive relief under § 10(j), we turn first to the relevant statutory text for the standards of review.  Section 10(j) provides as follows:

> The Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).  We recognize that "[t]he words of this section are unquestionably vague and provide little help to the [d]istrict [c]ourt."  *Boire v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 479 F.2d 778, 787 (5th Cir. 1973) ("*Teamsters*").  Nonetheless, we have observed as an initial insight "that § 10(j) does not authorize the Regional Director to seek an injunction in *every* unfair labor practice case."  *Id.*

The proper framework for reviewing a § 10(j) petition is a subject of some differences among the circuits.  This Circuit, along with a number of other circuits, has adopted a two-part test.  Specifically, this Court addresses: "(1) whether the Board, through its Regional Director, has reasonable cause to believe that unfair labor practices have occurred, and (2) whether injunctive relief is equitably necessary, or, in the words of the statute, 'just and proper.'"  *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1188–89 (5th Cir. 1975) ("*Pilot Freight*").  Other circuits apply a more traditional, four-part test for injunctive relief that requires the NLRB to show, among other things, a

sufficient likelihood of irreparable harm. *See Chester ex rel. NLRB v. Grane Healthcare Co.*, 666 F.3d 87, 93–94 (3d Cir. 2011) (identifying various courts that have rejected the two-part test).

At the outset, Creative Vision argues that we should overrule our two-part test based on the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008).[5] In *Winter*, the Supreme Court reversed the Ninth Circuit's judgment affirming the district court's grant of injunctive relief based on possible future harm. *Id.* at 33. Specifically, the Court held that

> [a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Id.* at 20. The Court rejected the Ninth Circuit's standard, explaining that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

Because *Winter* dealt with injunctive relief in a significantly different context from § 10(j) relief, it does not perfunctorily control here, especially given precedents of this Court that bind us. Specifically, we have reaffirmed our two-part test in the years following *Winter*, but we have also underscored

---

[5] The injunctive relief in *Winter* arose in a different factual context. In *Winter*, an environmental protection organization sought a preliminary injunction against Naval testing in the Pacific, arguing that the testing would negatively impact various marine mammals. 555 U.S. at 16–18. Obviously, the environmental organization was *not* invoking the specific injunctive relief authorized in § 10(j), which applies only in the context of labor violations. Thus, *Winter* does not mandate that we apply its test instead of our longstanding two-part test that specifically applies to § 10(j) injunctions.

No. 14-30839

that "the principles of equity inform an evaluation for § 10(j) relief." *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 851 (5th Cir. 2010). The Third Circuit applies the same two-part test, reasoning that the four equitable prongs in *Winter* are incorporated into the two-prong test. *Chester*, 666 F.3d at 98. The *Chester* court observed that the first prong of the two-prong test evaluates the likelihood of success on the merits, and the remaining three factors inform whether such relief is "just and proper." *Id.* at 99. Similarly, courts that apply the four-part analysis in the § 10(j) context necessarily "have made modifications . . . to accommodate the purposes and goals of the NLRA." *Id.* at 97.

Given these explanations of the two-prong test, with which we agree, we are persuaded that our two-prong review of § 10(j) petitions for injunctive relief is not inconsistent with Supreme Court precedent, and consequently, we do not overrule that standard. We are mindful, however, of the Supreme Court's directive in *Winter* that "[a] preliminary injunction is an extraordinary remedy *never* awarded as of right." 555 U.S. at 24 (emphasis added). Thus, we emphasize that the NLRB must establish both prongs of our two-part test with reasonable clarity in order to obtain injunctive relief.

2.

Only one part of the two-part test is at issue in this appeal; Creative Vision concedes that the NLRB has satisfied the first prong of the analysis. Thus, this appeal turns on the second prong: whether the NLRB has shown that injunctive relief was just and proper based on the balance of the equities. *See Overstreet*, 625 F.3d at 851. We review the district court's decision as to this prong for abuse of discretion. *Id.* at 850.

B.

The abuse of discretion standard is often an elusive one, but a district court typically abuses its discretion if it: "(1) relies on clearly erroneous factual

findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 262 (5th Cir. 2012) (internal quotation marks omitted). Critically, "[w]here a district court rests its legal analysis on an erroneous understanding of governing law, it has abused its discretion." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 306 (5th Cir. 2007). Put another way, "[a] district court abuses is discretion when it misconstrues its proper role, ignores or misunderstands the relevant evidence, and bases its decision upon considerations having little factual support." *Arlook ex rel. NLRB v. S. Lichtenberg & Co.*, 952 F.2d 367, 374 (11th Cir. 1992).

## III.

Turning to this appeal, we hold that the district court abused its discretion in granting injunctive relief. The second prong for injunctive relief—that the proposed relief is "just and proper"—does not apply to the NLRB's petition for relief, certainly not at this time point in the litigation. Specifically, the district court rested its decision on the broad and general assumption that injunctive relief may issue whenever the unfair labor practice at issue causes harm, without considering the specific impact on the union or its employees in *this* case. Upon reviewing the relevant law, we conclude that the district court failed to make sufficient factual findings suggesting that Creative Vision's conduct was egregious or otherwise exceptional so as to warrant a § 10(j) injunction, particularly when the injunction issued several years after Creative Vision commenced the allegedly wrongful conduct.

## A.

Although a § 10(j) injunction involves discretion, its purpose is to "prevent *erosion* of the status of the parties pending [the NLRB's] final decision." *Pilot Freight*, 515 F.2d at 1188 (emphasis added). Our use of the term "erosion" necessarily implies that injunctive relief seeks to preserve the status quo ante when that status quo is capable of being preserved. Put

another way, injunctive relief serves its purpose, and should issue, when: (1) the employer's alleged violations of the NLRA and the harm to the employees or to the union are concrete and egregious, or otherwise exceptional; and (2) those harms, as a practical matter, have not yet taken their adverse toll, such that injunctive relief could meaningfully preserve the status quo among the employer, the union, and the employees, that existed before the wrongful acts occurred.[6]

Our caselaw adopts both of these principles. As to the first, we have been clear that a § 10(j) injunction is an "extraordinary remedy" to be employed only in the event of "egregious unfair labor practices." *Id.* at 1192. To constitute "egregiousness" for purposes of § 10(j), a labor practice must lead to exceptional injury, as measured against other unfair labor practices. The NLRA prohibits specific unfair conduct between adversaries, and most, if not all, conduct that is prohibited by the NLRA has the potential to, and often does, cause serious harm to competing unions, to the work force, and/or to employers. Yet, we have recognized that the NLRB's administrative procedures should generally control and that "measures to short-circuit the NLRB's processes should be sparingly employed." *Id.* To confine § 10(j) injunctive relief to its proper role, the NLRB must show, and the district court must find, that the unfair labor

---

[6] We recognize an ambiguity in the existing precedents as to whether we measure the injury by considering harms to the union, employees, or both. In *Pilot Freight*, this Court tended to balance the harm by considering the impact solely on the employer on one side and the union on the other. *See* 515 F.2d at 1194. In *Overstreet*, we looked in part to the "cause of the anti-Union sentiment among the workers." 625 F.3d at 856. Other courts look more directly to the effects of unfair labor practices on both the union and the workforce collectively. *See, e.g.*, *Maram v. Universidad Interamericana de P.R., Inc.*, 722 F.2d 953, 959 (1st Cir. 1983) (finding irreparable harm because "this was a discharge of the entire workforce in the face of unionization"). We recognize that there is often a necessary interplay between the workforce and the union when assessing harms as a result of unfair labor practices. We need not establish an exact standard in this case, though, because the district court's findings, and indeed the record, are inadequate under any framework.

practice, in the context of that particular case, has caused identifiable and substantial harms that are unlikely to be remedied effectively by a final administrative order from the NLRB.

The second principle, considered in the conjunctive with the first principle above, establishes that § 10(j) relief is only appropriate when "any final order of the NLRB would be meaningless and the remedial purposes of the Act will be frustrated without an injunction to preserve the status quo." *Overstreet*, 625 F.3d at 851. Thus, injunctive relief should issue when harms are ongoing, yet incomplete and likely further to harm the union or its supporters in the workforce. For example, if a harm is of a routine character in the NLRA context, the parties usually can redress such wrongs under the NLRB administrative processes. *See Muffley ex rel. NLRB v. Spartan Mining Co.*, 570 F.3d 534, 545–46 (4th Cir. 2009) (approving of the district court's decision narrowly to tailor its injunctive relief to preserve "a critical mass of bargaining unit employees . . . such that, if the Board approves the ALJ's proposed order, the union will be able to reassert its role as representative of those employees").

In sum, a district court reviewing a petition for § 10(j) injunctive relief should provide only relief that is necessary and must issue specific findings of fact that suggest harm requiring § 10(j) injunctive relief. *See Overstreet*, 625 F.3d at 851 (recognizing that equitable principles such as irreparable harm inform this Court's existing § 10(j) analysis). In the light of this background, we turn to the district court's findings in this case.

## B.

We thoroughly have reviewed the relevant record, the district court's order, and the reasons supporting its injunctive order. This review indicates that the district court has not pointed to the type of conduct or current harms that warrant § 10(j) relief. Instead, the district court relied in large part on

generalizations to support its conclusion that the NLRB was entitled to an injunction.  The district court's order fails to address adequately relevant and key facts in the case before it, including the three-year delay between the union's filing of its complaint and the issuance of the injunction.

Cases from this Circuit and other circuits provide an appropriate contrast.  For example, in *Teamsters*, this Court affirmed a § 10(j) order enjoining a union from striking.  479 F.2d at 782.  We concluded that such relief was appropriate because the company would be compelled either to resist the strike, which "quite clearly would result in severe financial loss to the Company as well as a significant decline in important public services," or acquiesce to it, allowing the union "to get a toe-hold on the Florida operation that would prove most difficult to overcome." *Id.* at 788.  Thus, in *Teamsters* substantial, identifiable harms would occur in the absence of an injunction regardless of the action the company chose.

Similarly, the Eleventh Circuit concluded that injunctive relief should issue in a case of egregious employer misconduct in which the employer "engaged in a panoply of unfair labor practices" by firing employees as a result of a labor dispute, enforcing new workplace rules, and engaging in other threatening activity to dissuade union participation. *Arlook*, 952 F.2d at 369–71.  The *Arlook* court emphasized that the union recently had been certified and, more importantly, there was evidence of a pervasive fear among the work force that they would be retaliated against for providing any support for the union. *Id.* at 373.  Thus, the court noted that "[t]he Company has not merely fired a few employees, or altered one or two minor rules.  Rather, the allegations *span the gamut of labor violations.*" *Id.* at 374 (emphasis added).  Because the wrongs were so egregious, "[w]ithout an injunction, the Board's ability to foster peaceful labor negotiations through normal procedures would be imperiled." *Id.*  Other circuits have similarly required § 10(j) relief when an

unfair labor practice tends to decimate an entire work force. *See Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247–48 (3d Cir. 1998) (remanding so that the district court could enjoin a company from selling a manufacturing plant when the company sought to shut down a Pennsylvania plant, lay off the work force there, and move the work to a plant in Georgia in order to avoid negotiations with a union); *Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953 (1st Cir. 1983) (remanding for issuance of an injunction in a case involving "a discharge of the entire workforce in the face of unionization").

These cases provide a defining contrast to the findings in the district court's order. In its order, the district court stated that Creative Vision's "failure as successor to negotiate with the Union disrupted the status quo ante, and temporary injunctive relief will restore that status quo." To be sure, this result is not an uncommon consequence in successor cases that arise before the NLRB. The district court did not articulate specifically *how* this particular conduct created an egregious case of refusal to bargain. The district court did not explain, for example, how Creative Vision's work force or the union suffered egregious or otherwise exceptional harm within the context of the usual NLRA cases as a result of Creative Vision's failure to bargain. Nor did it indicate the reasons a § 10(j) injunction is now more appropriate to address these issues than a Board order enforced through processes established under the NLRA. To the contrary, the district court, in fact, concluded that it could not identify "any reason why restoring the bargaining relationship now would be *less effective* than later NLRB relief." ROA.879. This statement of the district court is clearly contrary to *Pilot Freight*, as injunctive relief must be affirmatively *more* effective than a final decision from the NLRB. 515 F.2d at 1192.

Critically, the district court's findings do not support a conclusion that Creative Vision's conduct was in the *egregious* category, as compared to other

unfair labor practices, as our Circuit plainly requires. *Id.* Injunctive relief may be warranted, for example, when unfair labor practices cause severe anti-union sentiment to emerge, but the district court made no factual finding suggesting that such sentiment has developed here. *Cf. Overstreet*, 625 F.3d at 856–57 (concluding that a district court could issue an injunction based in part on evidence that the employer's activities had been "a direct cause" of anti-union sentiment and that the actions "led to several petitions to decertify the Union as the workers' representative"). To the point, the district court's findings do not indicate specific, *egregious or exceptional*, employer conduct or harms in this case that support a § 10(j) injunction, as this Court's precedent plainly requires.[7] *See Pilot Freight*, 515 F.2d at 1192. The district court's omissions are particularly pronounced on these facts because it issued the injunction some three years after the alleged unfair labor practices were initiated. Thus, we conclude that the district court and the NLRB have failed to articulate either evidence or reasons, in the context of the NLRA violations, that justify resorting to an injunction.

On appeal, the NLRB argues that the injunction should issue because the unfair labor practice here is failure to bargain in the successorship context: that is, where a new employer takes over a pre-existing group of unionized employees and refuses to bargain with the employees' "former" union. The NLRB points to the Supreme Court's decision in *Fall River Dyeing & Finishing Corp. v. NLRB*, which recognized that a union is especially vulnerable when

---

[7] The NLRB does make several references to specific harms in its brief. Specifically, it stated that Creative Vision hoppers now have fewer holidays, that several employees have faced discipline without union support or grievance procedures, and that Creative Vision *may* alter the hoppers' terms of employment without adequate consultation. We emphasize, however, that the district court did not address any of these points, or counterpoints thereto, when it considered equitable necessity. Although we can certainly sympathize with the employees, who have fewer benefits, these grievances will be addressed by the Board's administrative remedy.

negotiating with a successor employer because it is "uncertain about the new employer's plans, and cannot be sure if or when the new employer must bargain with it." 482 U.S. 27, 39 (1987). *Fall River*, however, does not involve § 10(j) of the NLRA, and consequently does not authorize an injunctive remedy as a substitute for the established administrative remedy. Indeed, the *Fall River* Court addressed a final NLRB administrative decision that had proceeded under the appropriate administrative framework, which lends some support to the point that the administrative process can deal effectively with many successorship cases. *See id.* at 34–35.

Nonetheless, the NLRB points us to various other courts that have referenced *Fall River* in the § 10(j) context.[8] *See, e.g., Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1194–95 (9th Cir. 2011). To the extent that *Small* authorizes injunctive relief based solely on the type of labor practice at issue, we find it unpersuasive. Indeed, we note that the *Small* court relied substantially on speculative and generalized harms, emphasizing, for example, "that failure to bargain will *likely* cause a myriad of irreparable harms." *Id.* at 1191 (emphasis added). In its brief, the NLRB engages in a similar line of reasoning, pointing out that Creative Vision's conduct discourages participation in the union without offering specifics regarding the impact in this case. Although we certainly acknowledge that the type of unfair labor

---

[8] To that end, the NLRB's counsel urged at oral argument that the NLRB's policy is to seek injunctive relief when the successor employer fails to bargain with the pre-existing union. In support, it filed a series of policy analyses from the Department of Labor suggesting that failure to bargain in this context is often an appropriate candidate for injunctive relief. To the extent that these documents establish a policy to *seek* injunctive relief in these cases, we decline to read them to demonstrate that the NLRB is *entitled* to injunctive relief in *all* cases where a successor employer refuses to negotiate with the union. At most, these documents suggest that we should require fewer *additional* facts to support injunctive relief in successorship cases than in other cases, but they do not support the view that injunctive relief should issue in every case without due consideration of the specific facts in that case.

practice plays a role in the quantity of proof that must be offered to establish egregious or exceptional harm, we hold that the district court must articulate specific reasons to justify the issuance of an injunction based on the facts in the specific case.

We recognize that any unfair labor practice may cause, and often does cause, serious harms affecting the rights of workers and labor unions. In many cases, the union is weakened as a result of unfair labor practices on the part of employers, and individual employees may lose important benefits of their employment as a result. We do not downplay the serious consequences of many unfair labor practices. The remedy for such practices, however, typically lies with the NLRB's administrative process—not with the district courts, which are often poorly equipped to deal with these complex and nuanced cases in a field of specialty law. Injunctive relief in the federal district court under § 10(j) is available and appropriate when the unfair labor practices are particularly egregious or otherwise exceptional, as compared to other NLRA violations. *See Pilot Freight*, 515 F.2d at 1192. Both the NLRB and the district court have failed to articulate facts that suggest the administrative process is insufficient to afford relief in this case as it now appears before us.

## IV.

In sum, we hold that the NLRB and the district court have failed to establish specific egregious or exceptional harms in the context of this case that warrant § 10(j) relief. The alleged unfair labor practices here, although significant, are not of the egregious or exceptional category, when compared to other NLRA violations. Because the petition for injunctive relief has been pending for several years and is now before the NLRB for a final decision, the extraordinary remedy of a § 10(j) injunction is unnecessary as far as appears on the record before us. Thus, the district court abused its discretion by granting this injunction. We therefore remand this case for such further

No. 14-30839

proceedings and reconsideration in the light of this opinion, as may be deemed appropriate in the discretion of the district court.

VACATED and REMANDED.